## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIMOLINER, INC.,<br>      Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | NO. 05-11888 |
| SETRA OF NORTH AMERICA, INC.,<br>      Defendant. | )<br>) | |
| SETRA OF NORTH AMERICA, INC.,<br>      Third-Party Plaintiff, | )<br>)<br>) | |
| vs. | )<br>) | |
| UPSTATE TOURS, INC. and UPSTATE<br>TRANSIT, INC.,<br>      Third-Party Defendants. | )<br>)<br>) | |

### OPPOSITION TO UPSTATE TRANSIT, INC.'S MOTION TO DISMISS

Defendant/Third-Party Plaintiff SETRA OF NORTH AMERICA, INC. ("SETRA")
states the following for its Opposition to Third Party-Defendant UPSTATE TRANSIT, INC.'S
("UPSTATE") Motion to Dismiss:

### INTRODUCTION

On or about August 17, 2005, plaintiff LIMOLINER, INC. (hereinafter referred to as
"LIMOLINER") filed a Complaint in the Norfolk Superior Court seeking damages for injuries it
allegedly sustained as a result of its purchase of a used motorcoach from SETRA on or about
May 31, 2004.  On May 15, 2006, SETRA filed its Answer and Affirmative Defenses to the
Complaint, denying all material allegations against it.  In its Complaint, LIMOLINER alleges
that SETRA provided an inaccurate written certification to LIMOLINER stating that the actual
mileage of the motorcoach was 152,002 miles and that, in April 2005, LIMOLINER learned that
the actual mileage of the motorcoach was approximately 409,000.

Thereafter, by leave of this Court, SETRA filed a Third-Party Complaint against two entities, either or both of which is believed to have been the company that sold the bus in question to SETRA – UPSTATE TOURS, INC., and UPSTATE TRANSIT, INC. Both entities were served with the summons and Third-Party Complaint on August 21, 2006, and copies of the Affidavits of Service are attached hereto as **Exhibit A** and made a part hereof.

To the knowledge of the undersigned, UPSTATE TOURS, INC., has never responded to this suit. UPSTATE TRANSIT, INC., has filed a limited appearance and the motion challenging the Court's jurisdiction. The Court allowed the parties to take the deposition of the affiant to the motion, Glenn Matthews, both as to the jurisdictional issues and the substantive issues in the underlying case. As is more fully detailed below, Matthews testified that SETRA received the motorcoach at issue in December 2003 from UPSTATE in a transaction in which SETRA sold new motorcoaches to UPSTATE and accepted several trade-ins of used motorcoaches. The motorcoach at issue was one of the "trades." At the time of the sale to SETRA, UPSTATE provided SETRA with an Odometer Disclosure Statement affirming that the mileage on the motorcoach at issue was 151,981 miles. UPSTATE'S president, Glenn Matthews, conceded in his deposition that his company's Odometer Disclosure was wrong, that the odometer on the vehicle in question had been replaced and reset so that the new odometer understated the actual mileage on the motorcoach in question by at least 105,000 miles. (Deposition of Glenn Matthews, attached hereto as **Exhibit B** at p. 58.) SETRA relied on UPSTATE'S Odometer Disclosure Statement when it accepted the coach and when it sold the motorcoach to LIMOLINER several months later.

As set forth in more detail below, UPSTATE'S motion must be denied because UPSTATE is subject to both the general and specific jurisdiction of this Court.

## ARGUMENT

Both the specific and general personal jurisdiction analyses are comprised of three questions: 1) whether the Massachusetts long-arm statute authorizes jurisdiction; 2) whether the defendant has sufficient minimum contacts with the forum state such that the exercise of jurisdiction does not offend due process; and 3) whether the exercise of jurisdiction is reasonable, and does not offend due process. *Noonan v. The Winston Co.*, 135 F.3d 85, 89 (1st Cir. 1998). General jurisdiction will be discussed in Point I, and specific jurisdiction will be discussed in Point II. Point III will address whether the exercise of jurisdiction over UPSTATE is reasonable.

## POINT I

## UPSTATE IS SUBJECT TO THE GENERAL JURISDICTION OF THIS COURT.

General jurisdiction exists when "the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992). To be subject to general personal jurisdiction, UPSTATE must have "certain minimum contacts with [Massachusetts] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington*, 326 U.S. 310, 316 (1945) (internal citations omitted). The minimum contacts test requires "in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). A defendant's connection with the state must be such that "he should reasonably anticipate being

haled into court" in the state in the event of a dispute.  *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

**A.     The Massachusetts Long-Arm Statute Authorizes Jurisdiction.**

Under the Massachusetts long-arm statute, a court may exercise personal jurisdiction over a non-resident defendant as to a cause of action arising from the person's "causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from the goods used or consumed or services rendered, in this commonwealth . . ." M.G.L. 223A, § 3(d).

In the instant case, the first requirement of section 3(d) of the long-arm statute is met. UPSTATE has caused tortious injury in Massachusetts by an act or omission that it committed outside of Massachusetts.  LIMOLINER alleges that it suffered tortious injuries in Massachusetts as a result of its purchase of the motorcoach that had an inaccurate odometer.  SETRA, which re-sold the motorcoach to Limoliner in Massachusetts suffered tortious injury by taking possession of a motorcoach that had an inaccurate odometer.  SETRA has been forced to defend against LIMOLINER'S claims against it in Massachusetts.

**B.     UPSTATE Has Sufficient Minimum Contacts with Massachusetts and Derives Revenue From the Services It Provides in Massachusetts To Be Subject to General Jurisdiction.**

UPSTATE has a variety of contacts with Massachusetts, thereby making the assertion of general jurisdiction proper.  Glenn Matthews, UPSTATE'S president, testified that UPSTATE TRANSIT has operated motorcoach tours into Massachusetts for approximately ten years. (**Exhibit B**, at pp. 12-13.)  Mr. Matthews testified that UPSTATE runs tours to Fenway Park, as well as shopping trips to downtown Boston and "hauntings" tours to Salem.  (**Exhibit B** at pp.

13-14, 84). UPSTATE operates such tours at least once per year. (**Exhibit B** at p. 14.) In connection with these trips, UPSTATE made arrangements for lodging, parking, event tickets, and meals for the tours it planned. (**Exhibit B** at pp. 25, 75-76.) On overnight trips, UPSTATE'S drivers would stay with the groups in Massachusetts. (**Exhibit B** at p. 71.) UPSTATE'S coaches also paid highway tolls when they operated tours on Massachusetts roadways. (**Exhibit B** at p. 92.) UPSTATE'S drivers frequently also used Massachusetts roads to travel to other destinations beyond Massachusetts, such as New Hampshire. (**Exhibit B** at p. 71.) Mr. Matthews also testified that from the mid-1990s through 2005, customers could hire UPSTATE to privately charter tours into Massachusetts. (**Exhibit B** at p. 15.)

UPSTATE TRANSIT has derived nearly 1% of its annual revenues from the services it provides in Massachusetts. (**Exhibit B** at p. 70). It is well settled that "substantial revenue" is neither an absolute amount nor an absolute percentage of total sales. *City of Boston v. Smith & Wesson Corp.*, 2000 WL 34018326, No. 99-02590 (Mass. Super. Nov. 21, 2000); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 219 (1st Cir. 1989). "All that is required is literal satisfaction of the statutory requirement." *Keds Corp.*, 888 F.2d at 219. Although Mr. Matthews estimated that less than one percent of UPSTATE'S annual revenue was generated from trips to Massachusetts, that is sufficient to fulfill the "substantial revenue" requirement. *See Keds Corp.*, 888 F.2d at 219 (finding that the sale of 6,000 pairs of shoes for $15,000 met the requirement); *Kolikof v. Samuelson*, 488 F. Supp. 881, 884 (D. Mass. 1980) (finding that 3.2% of the defendant's total sales being made in Massachusetts satisfied the requirement); *Mark v. Obear and Sons, Inc.*, 313 F. Supp. 373, 375-76 (D. Mass. 1970) (finding that $5,000 or 0.5% of total sales is "substantial revenue" for purposes of Section 3(d) of the long-arm statute and noting that

a "contrary finding would tend to defeat the legislative purpose of protecting the rights of the citizens of the State.")

It is clear that UPSTATE has sufficient general jurisdictional contacts with Massachusetts and derives substantial revenue from the tours it operates in Massachusetts. Accordingly, this Court may exercise jurisdiction over UPSTATE and should deny UPSTATE'S motion to dismiss. Asserting personal jurisdiction over UPSTATE is also reasonable and does not violate due process, as explained further in Point III below.

## POINT II

## UPSTATE IS SUBJECT TO THE SPECIFIC JURISDICTION OF THIS COURT.

A court may exercise specific personal jurisdiction where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts. *Noonan*, 135 F.3d at 89. The First Circuit has identified a three-part test for specific jurisdiction: 1) the claim underlying the transaction must arise out of, or relate to, the defendant's forum-state activities; 2) the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable; and 3) the exercise of jurisdiction must be reasonable. *United Electric Radio & Machine Workers of America*, 960 F.2d at 1088. The third requirement is discussed in Point III.

### A.    SETRA'S Claims Against UPSTATE Relate To UPSTATE'S Forum-State Activities.

The Massachusetts long-arm statute permits the exercise of jurisdiction over a non-resident defendant for claims arising out of the defendant's transacting business in Massachusetts. M.G.L. 223A, § 3(a). As explained in section B below, UPSTATE transacted

business in Massachusetts, and SETRA'S claims result from this transaction of business. This Court may exercise jurisdiction over UPSTATE.

**B.      UPSTATE'S Minimum Contacts with Massachusetts Represent a Purposeful Availment of the Privilege of Conducting Activities In Massachusetts.**

Massachusetts courts construe the term "transacting any business" broadly. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994). Courts have held that participating in negotiations within the forum state regarding important contractual terms allows a court to exercise jurisdiction over non-resident entities. *Papa Gino's, Inc. v. Baystate Bagel's, Inc.*, 2001 WL 716881, No. CA0003708 (Mass. Super. May 11, 2001) (citing *United Electric Radio & Machine Workers of America*, 960 F.2d at 1090; *United Electric Radio & Machine Workers of America*, 960 F.2d at 1090 (collecting cases). In a contract case, the defendant's forum-based activities must be "instrumental in the formation of the contract." *Id.* at 1089 (internal quotations omitted).

In *Papa Gino's*, the plaintiff, a Delaware corporation doing business in Massachusetts and Connecticut, filed a suit for alleged breach a sublease of commercial property in Connecticut. 2001 WL 716881 at *1. The defendant, Baystate, was a Massachusetts corporation. *Id.* The plaintiff also sued the defendant's controlling shareholder as guarantor of the sublease. *Id.* The negotiations for the sublease occurred over the phone and by letter between the plaintiff's corporate counsel in Massachusetts and the defendants' counsel in Vermont. *Id.* The negotiations resulted in a written sublease between Baystate and the plaintiff guaranteed by the shareholder. *Id.* The guaranty was executed in Vermont. *Id.* The plaintiff filed suit after Baystate allegedly violated the sublease. *Id.* The shareholder moved to dismiss for lack of personal jurisdiction. *Id.* The court denied the motion, noting that the plaintiff's corporate offices were in Massachusetts at the time of the negotiations which led to the execution

of the sublease and the guaranty. *Id.* at * 3. Letters were sent and telephone calls were made to and from Massachusetts in furtherance of the negotiations. *Id.* The shareholder personally guaranteed Baystate's obligations to the plaintiff. *Id.* The court held that the evidence was sufficient to find that the shareholder transacted business in Massachusetts and therefore denied the motion to dismiss. *See also Sonesta International Hotels Corp. v. Central Florida Investments, Inc.*, 47 Mass. App. Ct. 154, 160-61 (1999) (asserting jurisdiction over a non-resident defendant that initiated a relationship that it understood would involve, and did involve, multiple contacts with a Massachusetts-based organization).

The cases cited by UPSTATE in its motion to dismiss are distinguishable. In those cases, the defendants' transaction of business in Massachusetts was limited to the solicitation of business. As discussed below, however, UPSTATE directly participated in important contractual negotiations within Massachusetts. UPSTATE clearly did more in Massachusetts than the mere solicitation of business.

In the instant case, UPSTATE claims that negotiations and communications regarding the transaction occurred in New York and SETRA'S offices in North Carolina. According to UPSTATE, "[t]he transaction was proposed, negotiated, and consummated wholly outside of Massachusetts." UPSTATE further claims that UPSTATE did not direct any correspondence to Massachusetts in connection with the transaction and did not purposefully direct any activity related toward the transaction toward Massachusetts. However, that is not accurate.

Drew Tuller, UPSTATE'S Vice-President, approached Darril King, SETRA'S Regional Manager – Northeast, about the transaction via telephone in Massachusetts. (See Affidavit of Darril King, attached hereto as **Exhibit C**, at ¶ 9). Glenn Matthews acknowledged in his deposition that Darril King was Mr. Tuller's initial contact person. (**Exhibit B** at p. 42.) Mr.

Tuller was aware that King worked from his home office in Newburyport, Massachusetts. (**Exhibit C** at ¶ 10.) King was the SETRA employee primarily responsible for negotiating the transaction. (**Exhibit C** at ¶ 7.) King lived and worked from his home office in Massachusetts at all times that the transaction was negotiated and finalized. (**Exhibit C** at ¶ 10.) Glenn Matthews testified that UPSTATE's Drew Tuller and SETRA's Darril King had several face-to-face meetings about the transaction, and that Mr. Tuller communicated with Mr. King by email and the telephone on a regular basis. (**Exhibit B** at pp. 46-47; **Exhibit C** at ¶¶ 11-12.) Matthews did not deny that Darril King sent emails and made telephone calls from his Massachusetts office to UPSTATE. (**Exhibit B** at p. 67-68.)

The initial stages of the transaction included putting together a list of specifications for the new coaches that UPSTATE wanted to purchase. (**Exhibit B** at p. 43.) Tuller and King communicated extensively about the specifications, which included the number of seats, headrests, tray tables, media inside the coach, the material for the entrance side panel, and graphics and logos, among other items. (**Exhibit C** at ¶ 13.) Finally, King even made arrangements from his Massachusetts office for Drew Tuller and a companion to travel to Germany to view the facility where coaches are built, and he later made arrangements for SETRA to assume the cost of $9,600 for airfare related to the trip. (**Exhibit C** at ¶ 14.)

Drew Tuller and UPSTATE were aware that UPSTATE negotiated the transaction with a SETRA employee who resided and worked in Massachusetts. As in the *Papa Gino's* case, emails were sent and telephone calls were made to and from Massachusetts in furtherance of the negotiating the transaction. UPSTATE does not deny that these communications took place. Tuller and King communicated extensively about the specifications for the new coaches that were being built as part of the transaction. As noted by the *Papa Gino's* court, participating in

negotiations about important contractual terms within Massachusetts allows a court to assert jurisdiction over a non-resident defendant. Tuller's contacts with Mr. King in Massachusetts were instrumental in forming the transaction, and SETRA'S claims against UPSTATE relate to Mr. Tuller and UPSTATE'S activities within Massachusetts. Glenn Matthews' affidavit in support of UPSTATE's motion does not mention the electronic and telephone communications between his company and SETRA's Massachusetts sales representative, Darril King. However, he conceded that those communications did occur, and that he simply thought that King officed out of New Hampshire and then admitted that he did not know where King lived. (**Exhibit B** at p. 42-43).

Based on the above facts and testimony, as well as Darril King's affidavit in support of SETRA's opposition papers, UPSTATE conducted negotiations in Massachusetts related to this specific transaction and, therefore, transacted business in Massachusetts. In so doing, UPSTATE purposefully availed itself of the privilege of conducting contract negotiations and other activities in Massachusetts. SETRA'S claims against UPSTATE relate to those negotiations and that specific business transaction. Accordingly, this Court may exercise jurisdiction over UPSTATE and UPSTATE'S motion to dismiss must be denied.

## POINT III

## EXERCISING JURISDICTION OVER UPSTATE DOES NOT OFFEND DUE PROCESS.

**A.**     **Exercising Jurisdiction Over UPSTATE Is Reasonable.**

Courts determine whether exercising jurisdiction is reasonable by applying factors described as the "Gestalt factors." *Noonan*, 135 F.3d at 89. The criteria are: 1) the defendant's burden of appearing; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the judicial system's interest in obtaining

the most effective resolution of the controversy; and 5) the common interests of all sovereigns in promoting substantive social policies. *Id.* Each factor will be examined in turn below.

**B.     The Balance of the "Gestalt Factors" Favors Exercising Jurisdiction Over UPSTATE.**

    **1.     The Defendant's Burden of Appearing**

SETRA does not dispute that there is some burden associated with UPSTATE having to defend itself in Massachusetts when its place of business is in New York. However, the First Circuit has recognized that it is "almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." *Workgroup Technology Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 115 (D. Mass. 2003). Therefore, for this factor to have any significance, a defendant must demonstrate that the exercise of jurisdiction is "onerous in a special, unusual, or other constitutionally significant way." *Id.* In *Wolverine Proctor & Schwarz, Inc. v. Aeroglide Corp.*, the court noted that the defendant did business internationally and in other states when concluding that the defendant did not meet its burden. 394 F. Supp. 2d 299, 310-311 (D. Mass. 2005) (collecting other cases). In *Pritzker v. Yari*, the court held that the burden was not satisfied simply in the need to travel from New York to Puerto Rico. 42 F.3d 53, 64 (1st Cir. 1994).

In the instant case, UPSTATE has failed to show that litigation in Massachusetts would be unusually onerous. UPSTATE merely alleges that it will be burdened by defending an action in a foreign jurisdiction. UPSTATE has not met its burden. Moreover, UPSTATE regularly organizes tours and trips in New England and the east coast – with destinations as far away as California. (**Exhibit B** at p. 71.) UPSTATE cannot sincerely claim that defending this case in Massachusetts would be too burdensome. One reading UPSTATE's memorandum in support of this motion finds that UPSTATE has essentially conceded that jurisdiction would be proper in either New York or North Carolina. One looking at a map finds that North Carolina is certainly

a far greater distance to travel to defend the SETRA claim than is the distance to this Court. Therefore, this factor weighs in favor of exercising jurisdiction and denying UPSTATE'S motion to dismiss.

## 2.    The Forum State's Interest in Adjudicating the Dispute

Although SETRA disagrees with UPSTATE'S claims that it did not cause tortious injury within Massachusetts, the First Circuit has recognized that the court's task is "not to compare the interest of the two sovereigns – the place of the injury and forum state – but to determine whether the forum state *has* an interest." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 718 (1st Cir. 1996) (emphasis in original). In *Nowak*, the plaintiffs brought a wrongful death suit against the foreign owner of a hotel in Hong Kong after their wife and mother drowned in the hotel's pool. *Id.* at 710. The defendant moved for dismissal for lack of personal jurisdiction and alternatively for dismissal on the grounds of *forum non conveniens*. *Id.* The First Circuit affirmed the district court's denial of the motions. *Id.* The First Circuit noted that significant events took place in Massachusetts giving it an interest in the litigation. *Id.* at 718. The defendant solicited business in the state. *Id.*

In the instant case, Massachusetts has an interest in the third-party claim. SETRA'S third-party action against UPSTATE is based on the underlying action filed against SETRA and pending in this Court. As explained throughout this brief, significant contract negotiations with respect to the transaction took place in Massachusetts, giving Massachusetts an interest in the litigation. Moreover, LIMOLINER, with its place of business in Massachusetts, was allegedly injured as a result of UPSTATE'S actions. Massachusetts has an interest in these actions and in adjudicating alleged violations of its consumer protection laws. *Workgroup Technology Corp.*, 246 F. Supp. 2d at 115. Therefore, this factor also weighs in favor of exercising jurisdiction.

### 3.    The Plaintiff's Interest in Obtaining Convenient and Effective Relief

This factor also favors exercising jurisdiction because SETRA'S choice of forum must be accorded deference. *Id.*; *Wolverine*, 394 F. Supp. 2d at 311 (stating that the First Circuit has repeatedly observed that "a plaintiff's choice of forum must be accorded a degree of deference with respect to issues of its own convenience."). In *Wolverine*, a trade secrets case, the court noted that it would be convenient for the plaintiff to litigate its claims in a forum in which it operates and in which its key personnel maintain their offices. *Id.* The defendant was incorporated and had its principal place of business in North Carolina. *Id.* at 303. The court noted that the fact that relevant witnesses and documents were located in North Carolina did not establish that North Carolina courts presented a more convenient forum. *Id.* at 311. It also recognized that none of the plaintiff's witnesses or documents were located in North Carolina. *Id.* The court found that this factor weighed in favor of exercising jurisdiction.

In the instant case, UPSTATE – located in New York – is much closer to Massachusetts than SETRA is in North Carolina. Counsel traveled to Albany for Mr. Matthews' deposition, so UPSTATE and Mr. Matthews were not inconvenienced. Massachusetts is more convenient for SETRA to litigate this matter than another forum, particularly because the underlying action against SETRA is already pending before this Court. As noted below, the two causes of action are related and it therefore makes perfect sense to litigate all the claims in one action. Furthermore, Darril King, the SETRA employee most involved with the transaction, works and resides in Massachusetts and his file with documents relevant to the transaction is located in Massachusetts. Therefore, this factor also weighs in favor of exercising jurisdiction.

### 4.   The Judicial System's Interest in Obtaining the Most Effective Resolution of the Controversy

The fourth factor "counsels against furcation of the dispute among several different jurisdictions. Such a result would both contravene the goal of judicial economy and conjure up the chimera of inconsistent outcomes." *Pritzker*, 42 F.3d at 64. *See also Nowak*, 94 F.3d at 718 (recognizing that preventing "piecemeal litigation" might favor one jurisdiction over another); *Yankee Group, Inc. v. Yamashita*, 678 F. Supp. 20, 23 (D. Mass. 1988). In *Yankee*, the plaintiff brought suit against the president of a Japanese corporation in his individual capacity. *Id.* at 21. In an action consolidated with the case, the corporation brought an action against the plaintiff seeking recovery of commissions allegedly due. *Id.* The president brought a motion to dismiss for lack of personal jurisdiction. *Id.* The court noted that it would be inconvenient for the plaintiff to be forced to litigate its claims against the president in Japan yet defend against the corporation's claims in Massachusetts. *Id.* at 23.

UPSTATE claims that Massachusetts has little interest in adjudicating the claims between UPSTATE and SETRA. However, UPSTATE neglects the fact the action between LIMOLINER and SETRA is currently pending before this Court. Because the third-party action involves the same claims and issues as the primary action, it would be convenient for all the parties to resolve this issue in one action. It also serves the interests of judicial economy to resolve these actions simultaneously. The alternative is for SETRA to file its claims against UPSTATE in Courts of either New York or North Carolina to resolve the third-party claim. That will not effect any efficiencies. Also, LIMOLINER has called UPSTATE a "necessary party" to the litigation. Therefore, Massachusetts certainly has an interest in this action, and this factor weights in favor of exercising jurisdiction.

5.    **The Common Interests of All Sovereigns in Promoting Substantive Social Policies**

In *Wolverine*, the court noted that the case did not involve any unique social or policy issues of concern either to Massachusetts or to North Carolina (where the defendant was incorporated and did business). *Wolverine*, 394 F. Supp. 2d at 311. Similarly, in the instant case, it does not appear that considerations of social policy are relevant to this case. Therefore, this factor is neutral and does not favor either party.

On balance, four of the "Gestalt factors" favor SETRA and exercising jurisdiction and one is neutral. Therefore, the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice and UPSTATE'S motion to dismiss for lack of personal jurisdiction should be denied.

**CONCLUSION**

Based on the foregoing, defendant/third-party plaintiff SETRA OF NORTH AMERICA, INC. respectfully requests that this Court deny UPSTATE TRANSIT, INC.'S motion to dismiss the third-party complaint for lack of personal jurisdiction.

**SETRA OF NORTH AMERICA, INC.**

By:     /s/ Kiley M. Belliveau
        James M. Campbell
        BBO 541882
        Kiley M. Belliveau
        BBO 661328
        CAMPBELL, CAMPBELL, EDWARDS &
        CONROY, P.C.
        One Constitution Plaza
        Third Floor
        Boston, Massachusetts 02110
        (617) 241-3000

AND

CREMER, KOPON, SHAUGHNESSY & SPINA,
LLC
William J. Cremer
Thomas R. Pender
Attorneys for Defendant/Third-Party Plaintiff
Setra of North America, Inc.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 726-3800

*# 150335*

## CERTIFICATE OF SERVICE

I, Kiley M. Belliveau, hereby certify that I served the within document upon all counsel of record via U.S. mail, postage prepaid on this 12th day of January, 2007.

/s/ Kiley M. Belliveau
Kiley M. Belliveau

*EXHIBIT*

*A*



 

United States District Court

Sheriff File Number – 06001532

District of Massachusetts

| |
|---|
| Limo Liner, Inc.<br><br>vs.<br><br>Upstate Tours Inc. |

**Affidavit of Service**

Third Party Summons & Third Party Complaint

State of New York - County of Saratoga        SS:

I, Deputy Sheriff Mark S Whitcher, Badge # 47 being duly sworn, deposes and says: that he/she is not a party to this action, is over 18 years of age and is a resident of the state of New York.  That on 8/18/2006 at 10:10AM, at 207 Geyser Road,  Saratoga Springs, NY 12866  deponent served the within Third Party Summons & Third Party Complaint on Upstate Tours Inc., the defendant named therein, in the following manner.

**CORPORATION**

By delivering to and leaving with Douglas Fortier, the General Manager for Upstate Tours Inc., personally a true copy thereof.

**DESCRIPTION**

The person served was approximately: Skin Color: White, Hair Color: Gray, Gender: Female,  Height: 5'10 ",   Weight: 190  Age: 50 .

**SERVICE ATTEMPTS**
This is the first attempt at service

Sworn to before me on  *21st August 2006.*

Notary Public

*Susan A. Bowen*

SUSAN A. BOWEN
Notary Public, State of New York
Residing in Saratoga County
Commission Expires June 13, 2010

Mark S Whitcher
Deputy Sheriff

47
Badge Number

  

United States District Court

District of Massachusetts

Sheriff File Number – 06001532

Limo Liner, Inc.

vs.

Upstate Transit Inc.

Affidavit of Service

Third Party Summons & Third Party Complaint

State of New York - County of Saratoga        SS:

I, Deputy Sheriff Mark S Whitcher, Badge # 47 being duly sworn, deposes and says: that he/she is not a party to this action, is over 18 years of age and is a resident of the state of New York. That on 8/18/2006 at 10:10AM, at 207 Geyser Road, Saratoga Springs, NY 12866 deponent served the within Third Party Summons & Third Party Complaint on Upstate Transit Inc., the defendant named therein, in the following manner.

**CORPORATION**

By delivering to and leaving with Douglas Fortier, the General Manager for Upstate Transit Inc., personally a true copy thereof.

**DESCRIPTION**

The person served was approximately: Skin Color: White, Hair Color: Gray, Gender: Female, Height: 5'10 ", Weight: 190 Age: 50 .

**SERVICE ATTEMPTS**
This is the first attempt at service

Sworn to before me on 21st August 2006

Notary Public

SUSAN A. BOWEN
Notary Public, State of New York
Residing in Saratoga County
Commission Expires        2010

Mark S Whitcher
Deputy Sheriff

47
Badge Number

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------------------------

LIMOLINER, INC.,

                              Plaintiff,

    - against -          Case No.: 05-11888

SETRA OF NORTH AMERICA, INC.,

                              Defendant,

--------------------------------------------------

SETRA OF NORTH AMERICA, INC.,

                              Third-Party Plaintiff,

    - against -

UPSTATE TOURS, INC. and UPSTATE
TRANSIT, INC.,

                              Third-Party Defendants.

--------------------------------------------------

        DEPOSITION of Third-Party Defendants,

UPSTATE TOURS, INC. and UPSTATE TRANSIT, INC. through

its agent, servant and/or employee, GLENN MATTHEWS,

held pursuant to Notice returnable on Tuesday, the 5th

Day of December 2006 at 12:00 p.m. at the law offices

of Whiteman, Osterman and Hanna, LLP, One Commerce

Plaza, Albany, New York, before ANN M. KOZA, a

Shorthand Reporter in and for the State of New York.

               A.S.E. REPORTING SERVICE
                 (518) 458-1091

A P P E A R A N C E S


RUDOLPH FRIEDMANN, LLP
92 State Street
Boston, Massachusetts 02109
BY:  JONATHON D. FRIEDMANN, ESQ., of Counsel
Appearing for Plaintiff, Limoliner, Inc.


CREMER, KOPON, SHAUGHNESSY AND SPINA, LLC
180 North LaSalle Street, Suite 3300
Chicago, Illinois 60601
BY:  THOMAS R. PENDER, ESQ., of Counsel
Appearing for Defendant and Third-Party Plaintiff
 Setra of North America, Inc.


WHITEMAN, OSTERMAN AND HANNA, LLP
One Commerce Plaza, 19th Floor
Albany, New York 12260
BY:  CHRISTOPHER M. McDONALD, ESQ., of Counsel
Appearing for Third-Party Defendant, Upstate
 Tours, Inc. and Upstate Transit, Inc.

3

```
 1              S T I P U L A T I O N S

 2

 3

 4      IT IS HEREBY STIPULATED AND AGREED by and between

 5  the attorneys for the respective parties hereto:

 6

 7

 8      THAT all objections to questions, except as to

 9  the form thereof, are reserved to the time of trial;

10

11

12

13      THAT all matters relating to this deposition

14  shall be pursuant to the Federal Rules and

15  regulations; and

16

17

18

19      THAT the transcript will be signed under the

20  Pains and penalty of perjury.

21

22

23
```

A.S.E. REPORTING SERVICE
(518) 458-1091

4

1      G L E N N   M A T T H E W S,

2        233 Menlo Park
        Niskayuna, New York 12309
3
  called as a witness, being first duly sworn.
4
  testified as follows:
5

6 BY MR. PENDER:

7    Q   Sir, for the record, would you say and spell

8 your name again?

9    A  Glenn Matthews.

10    Q   Mr. Matthews, my name is Tom Pender.  I

11 represent Setra of North America.  Good afternoon.

12 Let me just state for the record that your deposition

13 is being taken in this case by agreement of counsel

14 here in Albany, New York, in connection with this

15 litigation and we will be taking it pursuant to all

16 the applicable rules of the Federal District Court in

17 Boston, Massachusetts.  If at any time I ask you an

18 unintelligible question, which could pop up every now

19 and then given my history, please ask me for some

20 assistance, tell me you do not understand it, ask me

21 to rephrase it.  Whatever help you need, please ask

22 for it.  My intention and goal is for you to

23 understand my question so that the answer is

A.S.E. REPORTING SERVICE
(518) 458-1091

5

1 responsive.  Okay?

2      A    Uh-huh.

3      Q    Okay.  Try to avoid the uh-huh and uh-uh

4 sounds that won't really come out on the transcript

5 when we read it later on.  And we will remind you if

6 you do that, so don't take offense to that.  And if

7 you need a break at any time, just let me know, we

8 will accommodate you.  Okay?

9      A    Okay.

10      Q    Can you tell me who you currently work for?

11      A    Matthews Group.

12      Q    Where is Matthews Group located?

13      A    Ballston Spa, New York.

14      Q    How long has Matthews Group been in

15 existence?

16      A    1980.

17      Q    What is the business of Matthews Group?

18      A    It's a holding company for our companies.

19      Q    So it's strictly a holding --

20      A    Yes.

21      Q    And there are subsidiary companies

22 underneath that; is that correct?

23      A    Yes.

6

(G. MATTHEWS - PENDER)

1    Q    And what is your title with Matthews Group?

2    A    Vice president.

3    Q    Who are the other officers of the company?

4    A    My brother Brad is the president, Brad

5 Matthews.

6    Q    And do you and Brad own Matthews Group?

7    A    Yes, we do.

8    Q    What is Upstate Tours, Inc., or what was it

9 or --

10    A    Upstate Tours was the charter tour company

11 that we owned.

12            MR. McDONALD:  Just to clarify.  There

13        are two entities.  Upstate Tours, Inc. is an

14        unrelated, actually incorporated entity,

15        it's not a related party.  It's a d/b/a of

16        Upstate Tours.  I just wanted to --

17            MR. PENDER:  Well, we will get to that.

18    Q    Well, why don't we do this.  Let's start

19 off, if you could list the companies that are under

20 the Matthews Group umbrella presently, and if there

21 were any that were different back in the 2003 time

22 frame, let's know that.

23    A    Presently Matthews Buses, Incorporated.

A.S.E. REPORTING SERVICE
(518) 458-1091

7

(G. MATTHEWS - PENDER)

1 Rifle Air Conditioning.  Matthews Specialty Vehicles.

2      Q     That's it?

3      A     That's presently it.

4      Q     How about in 2003?

5      A     You would add Upstate Transit.  Actually,

6 I'm sorry.  Upstate Transit, Inc. is still in there.

7 And was then.  It's just different.  We can explain

8 that.

9      Q     Okay.  Please do.  What is the difference

10 between Upstate Transit and --

11      A     We had an asset sale.

12      Q     When?

13      A     A year ago in November 5th, I believe was

14 the date.

15      Q     Is that when Upstate Transit, Inc. became

16 Upstate Transit of Saratoga, LLC?

17      A     That's the name that they operate under.

18 Upstate Tours of Saratoga, LLC, I believe is the name

19 of it.

20      Q     That's what they operate under currently?

21      A     Yes.

22      Q     Previously it was Upstate Transit, Inc. and

23 it was an asset transfer?

A.S.E. REPORTING SERVICE
(518) 458-1091

8

(G. MATTHEWS - PENDER)

1     A     Right.

2     Q     What about the liabilities of Upstate

3 Transit, Inc., were they some how disposed of or

4 transferred or assumed?

5     A     No.

6     Q     Upstate Transit, both the Inc. -- well,

7 let's talk about Upstate Transit, Inc., back in 2003.

8 Was that a wholly owned subsidiary of the Matthews

9 Group?

10     A     Yes.

11     Q     How long was that company in existence?

12     A     Since 1980, I believe is the date.

13     Q     What was the business of Upstate Transit,

14 Inc.

15     A     It's a charter tour company and transit

16 company.

17     Q     When you say transit company, how is that

18 distinguished from charter?

19     A     Transit is we did line runs for the state on

20 the Northway.

21     Q     And counsel mentioned that Upstate Tours was

22 a d/b/a, a doing business as or an assumed name.  In

23 other words, some company was doing business as

A.S.E. REPORTING SERVICE
(518) 458-1091

9

(G. MATTHEWS - PENDER)

1 Upstate Tours?

2      A      Uh-huh.

3      Q      Is that correct?

4      A      It was the -- it was the same company.

5      Q      Upstate Transit, Inc.?

6      A      Uh-huh.

7      Q      You have to say yes.

8      A      Yes.  I'm sorry.

9      Q      That's all right.  So as far as you know,

10 Upstate Tours was never separately incorporated, it

11 was always just an assumed name?

12      A      Yes.

13      Q      So for all practical purposes, to any person

14 that was booking a tour, or whatever, Upstate Tours

15 and Upstate Inc. were the same entity?

16      A      Yes.

17             MR. FRIEDMANNN:  You said Upstate, Inc.

18             You mean Upstate Transit, Inc.?

19      Q      Upstate Transit, Inc. and Upstate Tours were

20 the same entity; correct?

21      A      Correct.

22      Q      Was Upstate Transit, Inc., which has been

23 around since 1980, doing business as Upstate Tours

A.S.E. REPORTING SERVICE
(518) 458-1091

10

(G. MATTHEWS - PENDER)

1 since 1980?

2     A    Other way around.  No, it wasn't since '80,

3 no.  I don't know the exact date.

4     Q    The buses have Upstate Tours on the side of

5 them, right, or they did?

6     A    Yes.  We at one time owned a travel agency

7 and Upstate Transit didn't fit with the travel agency,

8 so the d/b/a was Tours.

9     Q    So that came into existence sometime after

10 1980?

11     A    Yes.

12     Q    Was Upstate Transit, Inc., back when it was

13 started, back in '80, in addition to being a charter

14 tour company and/or transit company, also doing travel

15 agency related services?

16     A    No.

17     Q    I thought you just told me it was also

18 travel?

19     A    Yes.  Not in '80, 1980.

20     Q    When about was that?

21     A    I don't know the exact date.

22     Q    How long have you been involved with Upstate

23 and Matthews Group?

A.S.E. REPORTING SERVICE
(518) 458-1091

11

(G. MATTHEWS - PENDER)

1    A    Officially working since 1986.  With Upstate

2 Transit, 2000.

3    Q    Before 1986, was there someone else who

4 owned these companies or ran them?

5    A    My Uncle Bruce.

6    Q    In the 2003 time frame that we are going to

7 be talking to you about today, the company that was

8 operating motor coach tours was Upstate Transit d/b/a

9 Upstate Tours?

10    A    Yes.

11    Q    And where were the locations of that

12 business, the location or locations?

13    A    Saratoga Springs, New York.

14    Q    Have they ever had any other offices or

15 locations?

16    A    Can we go off the record for one second?

17    Q    Sure.

18        (Discussion off the record.)

19    Q    I have a question pending.  Go ahead.

20    A    Yes.  Rhode Island.

21    Q    When did you have a Rhode Island operation?

22    A    '03, '04.

23    Q    And any particular reason why you had a post

12

(G. MATTHEWS - PENDER)

1  in Rhode Island during those years?

2       A     Yes.  We did an employee shuttle out there.

3       Q     What does that mean?

4       A     There's a company called Gilbane, and we did

5  employee parking lot shuttle bus work.

6       Q     At the Gilbane?

7       A     Yes.  They were building a facility and we

8  were doing from a remote parking lot to there.

9       Q     All within Rhode Island?

10      A     Construction work.  Uh-huh.  Yeah, it was --

11      Q     Now, Upstate Transit, slash, Tours has been

12  running motor coach tours around the eastern and

13  northeast part of the United States since the

14  beginning of the charter tour operation?

15      A     Yes.

16      Q     How long has Upstate Transit, Upstate Tours,

17  been running motor coach tours into Massachusetts

18  destinations?

19            MR. McDONALD:  For clarification, to

20            the extent that you are seeking

21            jurisdictional facts, I understand that is

22            why we are here, I just object.  Because

23            jurisdiction needs to be established as of

A.S.E. REPORTING SERVICE
(518) 458-1091

13

(G. MATTHEWS - PENDER)

```
 1          the time that the complaint was filed in

 2          this action as against our client.  So to

 3          the extent that you are seeking information

 4          prior to that, I object.

 5               But you can go ahead and answer.

 6     A    I don't know the specific time frame.

 7     Q    Okay.  Do you know approximately?  Back in

 8 the 1980's were you running trips into Massachusetts?

 9     A    No.  No.

10     Q    How about the 1990s?

11     A    I'm trying to count back.  It would be in

12 the mid-1990s.

13     Q    So would ten years be a good approximation?

14     A    Yes.

15     Q    What destinations, specific destinations in

16 Massachusetts have you run coach tours to during this

17 time frame?

18     A    Personal knowledge would be Fenway Park and

19 shopping trips downtown.

20     Q    I believe Fenway Park is in a town called

21 Boston; correct?

22     A    Yes.

23     Q    How about -- and the shopping trips would be
```

A.S.E. REPORTING SERVICE
(518) 458-1091

14

(G. MATTHEWS - PENDER)

1 Boston as well?

2    A    Yes.

3    Q    How about Salem, Salem Massachusetts?

4    A    I'm not aware of that one.

5    Q    How many times per year, either specifically

6 or your best approximation, has Upstate Transit been

7 operating motor coach tours to Boston?

8    A    I don't know the answer to that.

9    Q    Is it more than one time per year?

10    A    Probably.

11    Q    And did Upstate Transit, slash, Upstate

12 Tours continue to run tours into Massachusetts, to

13 Boston, probably more than once a year, not only from

14 the mid-1990s but up to and including when the asset

15 purchase took place last year?

16    A    Post that, is that what you're asking?

17    Q    During that time period.  From the mid-1990s

18 when you began, you believe you began running into

19 Massachusetts until the asset transfer of last year,

20 between then, did the frequency of the going on trips

21 into Boston remain the same throughout that period?

22    A    I'm not sure if it remained the same.

23    Q    Do you have any reason to believe that it

A.S.E. REPORTING SERVICE
(518) 458-1091

15

(G. MATTHEWS - PENDER)

1 decreased or stopped at any time?

2      A      Well, if it were a charter, somebody is

3 requesting a charter to go there.  If it's a tour, it

4 would be a preset tour that was set up to go there,

5 so...

6      Q      So there were tours that were scheduled that

7 people could sign up for that went into places like

8 Boston; correct?

9      A      Yes.

10      Q      And then people could also privately ask,

11 you know, we've got a theater group that wants to go

12 see the Lion King in Boston, or something like that,

13 they could charter your buses?

14      A      Yes.

15      Q      Did that occur during that roughly ten-year

16 time frame from the mid-1990s until say last year,

17 2005?

18      A      Yes.

19      Q      How frequently did Upstate Transit, Upstate

20 Tours, have private charters into Massachusetts?

21      A      I don't know the answer to that.

22      Q      Is there some record kept of that?

23      A      There was, yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

16

(G. MATTHEWS - PENDER)

1    Q    Who maintains those records?

2    A    We sold the company, so I don't know if

3 they're available now or not.

4    Q    As far as you know, who was the last person

5 to have the records of Upstate Transit that would

6 include things like private charters into

7 Massachusetts?

8    A    Brown Coach.

9    Q    Were they the purchasers?

10    A    Yes.

11    Q    So can we agree, then, on the record that

12 Upstate Transit had private charters that went into

13 Massachusetts during that time frame, it's just you

14 cannot tell us with what frequency or regularity?

15    A    Correct.

16    Q    But it did happen during those ten years,

17 and it happened more than once a year I assume?

18    A    Yes.

19    Q    Let me ask you, I've got some exhibits here.

20 We'll start with this.  I'm going to mark as Group

21 Exhibit 1, it's a number of pages from the New York

22 State Department of State web site.  I don't have

23 copies of this, I'm sorry.  But these are listings I

17

(G. MATTHEWS - PENDER)

1  pulled up yesterday for some of the entities that we

2  have been talking about, and so I will show these to

3  your attorney and then ask you to just briefly look

4  through them.

5          (Exhibit 1 was marked for identification.)

6              MR. FRIEDMANNN:  Just tell me how many

7          pages they are.

8              MR. McDONALD:  Five.

9      Q    And not to be rude and be over your

10 shoulder, because I really don't want to, just so that

11 I can read it at the same time you are when I ask you.

12 Go ahead and take a look at that.  I don't know if any

13 of those documents mean anything to you.  But those

14 documents, as I said, purport to be printed off the

15 Secretary of State's web site yesterday and relate to

16 some of the companies that you told us about earlier

17 that are not only the Matthews Group, but some of the

18 companies under that umbrella, and specifically, for

19 instance, page two has a current listing for Upstate

20 Transit of Saratoga, LLC, as an active LLC in the

21 state.  And that is the current entity; correct?

22     A    Yes.  Nothing to do with me.

23     Q    And is this the entity that is owned by

A.S.E. REPORTING SERVICE
(518) 458-1091

18

(G. MATTHEWS - PENDER)

1 Brown Coach Company now?

2      A    Yes, I think.

3           MR. McDONALD:  If you don't know --

4      A    I don't know.  I thought it was Upstate

5 Tours.

6      Q    All right.  And that asset transfer took

7 place when, November of 2005?

8      A    November.

9      Q    About a year ago, okay.  So Upstate Transit

10 of Saratoga, LLC, is not currently an entity you are

11 involved with?  This entity has been sold or --

12      A    That was never LLC.  That was never one of

13 our companies.

14      Q    Okay.  And there's another one, Upstate

15 Tours, Inc., of Saratoga, 207 Geyser Road, Saratoga

16 Springs, New York, as an active domestic business

17 corporation.

18      Is that accurate, as far as you know, that there

19 is an active corporation called Upstate Tours, Inc.?

20      A    That's the d/b/a, right?

21           MR. McDONALD:  If you don't know, just

22           say you don't know.

23      A    I don't know.

A.S.E. REPORTING SERVICE
(518) 458-1091

19

(G. MATTHEWS - PENDER)

1    Q    You thought it was a d/b/a?

2    A    Yes.

3    Q    If it's incorporated, that's something you

4 don't know?

5    A    Right.

6    Q    But this 207 Geyser Road, Saratoga Springs,

7 is an address where you all have some facility;

8 correct?

9    A    No.

10    Q    Who is at 207 Geyser Road?

11    A    The Brown Coach Upstate Tours.

12    Q    Okay.  So maybe this is incorporated --

13 another Brown Coach incorporation, then?

14    A    I don't know.

15    Q    Okay, fair enough.  Here's one, Upstate

16 Transit, Inc., Saratoga County, an active domestic

17 business corporation.  It's got a service of process

18 address again as 207 Geyser Road, and then it lists

19 Glenn J. Matthews as chairman or chief executive

20 officer?

21    A    2900 Route 9.

22    Q    Glenn J. Matthews, is that you?

23    A    Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

20

(G. MATTHEWS - PENDER)

1     Q     And is this Upstate Transit, Inc., a company

2 of yours that is still in existence?

3     A     Yes.

4     Q     So this currently is a company that is under

5 the Matthews Group umbrella?

6     A     Correct.

7     Q     And the principal executive office is listed

8 as 207 Geyser Road, Saratoga Springs?

9     A     I believe that has been changed.  Paperwork

10 was filed to change that I believe.

11     Q     And then finally Matthews Buses, Inc., which

12 you mentioned is one of the companies currently under

13 the Matthews Group umbrella; correct?

14     A     Yes.

15     Q     And you are listed as the CEO of that, and

16 that's got a Ballston Spa address; correct?

17     A     Correct.

18     Q     Let me mark as Deposition Exhibit No. 2 some

19 web site information from the Matthews Buses web site

20 that I printed yesterday.  It's four pages.

21          (Exhibit 2 was marked for identification.)

22               MR. PENDER:  Let me show that to you,

23          Chris.  (Handing)

A.S.E. REPORTING SERVICE
(518) 458-1091

21

(G. MATTHEWS - PENDER)

1     Q     How long has Matthews Buses been in

2 existence?

3     A     Forty years.

4     Q     And it's a dealer in new and used motor

5 coaches and school buses; is that correct?

6     A     Not motor coaches, no.

7     Q     Just school buses?

8     A     Buses and commercial buses.

9     Q     Oh, commercial buses.  Any particular

10 brands?

11     A     Thomas Built School Buses.

12     Q     What types of commercial buses?

13     A     Champion Bus, Startrans Bus and Brawn Vans

14 and General Coach.

15     Q     And does Matthews Buses have a location in

16 Massachusetts?

17     A     No.

18     Q     Well, where is the New England sales office

19 located?

20     A     Connecticut.

21          MR. McDONALD:  Just to interrupt.  I'm

22          just going to note my objection to the line

23          of questioning concerning Matthews Buses

A.S.E. REPORTING SERVICE
(518) 458-1091

22

(G. MATTHEWS - PENDER)

1       because they are not a party to the

2       litigation.

3             But you can continue answering

4       questions.

5    Q    Okay.  That's all I had on that.  Thank you.

6 Does Matthews Buses -- before I leave that.  Does

7 Matthews Buses do service repair or maintenance on

8 buses?

9    A    Yes.

10    Q    Does Matthews Buses and has Matthews Buses

11 done service repair and/or maintenance on the coaches,

12 for instance, from Upstate Tours?

13    A    No.

14    Q    Who did the maintenance for Upstate Tours'

15 motor coaches?

16    A    Upstate Transit, Inc. and subcontractors.

17    Q    Occasionally if there was something --

18    A    Detroit Diesel.  Yeah.

19    Q    Let me show you Exhibit 3, which is another

20 web site printout.  It doesn't have a date on it.

21 It's a two-page printout?

22       (Exhibit 3 was marked for identification.)

23             MR. McDONALD:  I would just note it

A.S.E. REPORTING SERVICE
(518) 458-1091

23

(G. MATTHEWS - PENDER)

1          doesn't have a date on it.  You said that.

2               MR. PENDER:  This one does.  I will

3          mark Exhibit 4 so you guys can start looking

4          at that.

5          (Exhibit 4 was marked for identification.)

6     Q    That one does not have a printout date on

7 it, but at the top it has the Upstate Tours logo on

8 it.  And it's cut off here, because it was, for

9 whatever reason, not able to print.  But this was back

10 when Upstate Tours was under the Matthews Group;

11 correct?

12     A    There's no date on it, but --

13               MR. McDONALD:  I'm going to object to

14          the extent it is not a complete document.

15               MR. PENDER:  I mean it is a web site.

16               MR. McDONALD:  I understand.

17     Q    If you recognize that as that's the way it

18 looked.  I've got one coming that shows the way it

19 looks today.  It doesn't have the Matthews Group on

20 it.  I assume that was after the asset transfer, but

21 you can tell me otherwise.

22     A    Well, Upstate Transit was a subsidiary of

23 the Matthews Group, so...

24

(G. MATTHEWS - PENDER)

1    Q   Okay.  And this shows this was a list of the

2 trip of the months back sort of the last quarter of

3 2005 for Upstate Tours at that time?

4    A   Uh-huh.

5    Q   And it shows, as we talked about earlier, an

6 October 15th, 2005, Halloween Hauntings trip to

7 Salem, Massachusetts.  On October 29th, 2005, Yours

8 For The Day trip to Boston; correct?

9    A   Uh-huh.  Yes.

10    Q   That's consistent with what we talked about

11 earlier, some of the preplanned trips?

12    A   I don't know if they actually went or not.

13 Those are just advertisings.

14    Q   Do you know if they were canceled?

15    A   I don't know.

16    Q   Is that something that happens frequently,

17 that trips are advertised on the web site and they do

18 not end up occurring?

19    A   Yes.

20    Q   But at least as of that time you were

21 holding out that that trip was available, whether it

22 was ever taken or not is something you do not know;

23 correct?

A.S.E. REPORTING SERVICE
(518) 458-1091

25

(G. MATTHEWS - PENDER)

1     A     Correct.

2     Q     And then this is the one printed more

3 recently.  I think I marked that as Exhibit 4.  Now is

4 that after the asset transfer?

5     A     Yes.

6     Q     And so it would appear that Brown Coach, or

7 whoever is running that now, is still holding out that

8 they're taking trips to Boston, Salem; correct?

9     A     Yes.

10    Q     When Upstate Transit was within the Matthews

11 Group fold and was making charters into places like

12 Salem and Boston, if the trip would go through, would

13 your company then undertake to set up lodging, set up

14 meals, show tickets, Fenway Park tickets, things like

15 that?

16    A     Yes.  If it was a tour.

17    Q     Were they typically overnight tours?

18    A     Boston, not typically.  Some may have been.

19    Q     So, in any event, as a regular part of those

20 tours, a part of your duty or a part of what you were

21 providing was not only a transportation to and from,

22 but also prearranging things like tickets and places

23 to eat, places to lodge if it is an overnight trip,

26

(G. MATTHEWS - PENDER)

1 museums, things like that, is that fair?

2      A     For a tour, yes.

3      Q     And if hired for a private coach that wanted

4 to go somewhere, would you also be able to provide

5 those services, set up lodging, meals, things like

6 that?

7      A     No.  They did that themselves.

8      Q     You were strictly just moving them?

9      A     Yeah.

10     Q     Let me ask you a little bit about the bus

11 transaction that is sort of the center piece of this

12 lawsuit.

13     A     Uh-huh.

14     Q     Do you know which company it was that owned

15 the bus in question, which is one of twelve that was

16 traded in to Setra in connection with a late 2003

17 purchase of some new Setra buses?  Do you know which

18 company owned the buses?

19     A     Of our companies?

20     Q     Yes.

21     A     Upstate Transit, Inc.

22     Q     It is my understanding that the bus in

23 question was among some that were purchased new, and

A.S.E. REPORTING SERVICE
(518) 458-1091

27

(G. MATTHEWS - PENDER)

1 Prevost, P-R-E-V-O-S-T, the bus in 1999 and

2 essentially operated by you during the succeeding four

3 years or so until the trade in, is that fair?

4      A    Five years.

5      Q    Five years?

6      A    Yes.

7      Q    Okay.  Did the company maintain a trip log

8 that would be associated with each vehicle?  In other

9 words, if we took the VIN number for this vehicle, the

10 last, I call it the last five digits, that's how I go

11 by this, of 12717, if we pulled that, would there be a

12 log of the trips that that bus took?

13     A    I don't know that.

14     Q    Who would know that?

15     A    Probably Conrad.

16     Q    Conrad Thorwarth?

17     A    Uh-huh.

18     Q    What is his title?

19     A    He's the head of maintenance.

20     Q    Okay.  So he may know that, okay.  Do you

21 know --

22               MR. McDONALD:  What were the first

23               three digits of the VIN number you just

A.S.E. REPORTING SERVICE
(518) 458-1091

28

(G. MATTHEWS - PENDER)

1        wrote?

2              MR. PENDER:  2PCH -- I can give you the

3        whole VIN number.  33490X1012717.

4              MR. McDONALD:  Thank you.

5    Q    Do you know whether or not, as you sit here,

6 this vehicle that we have just identified was a

7 vehicle that made trips to Massachusetts either for

8 private or preset tours?

9    A    No, I do not.

10   Q    Again, that would be something, if those

11 records were maintained, that Conrad may know about;

12 correct?

13   A    Correct.

14   Q    And am I correct, based on a statement you

15 made previously, that Upstate Transit did sort of the

16 routine maintenance on buses such as this in its

17 fleet?

18   A    Yes.

19   Q    Occasionally if bigger ticket items needed

20 to be done, it was sent out to places like Detroit

21 Diesel and others?

22   A    Yes.

23   Q    And your company, or Upstate Transit,

A.S.E. REPORTING SERVICE
(518) 458-1091

29

(G. MATTHEWS - PENDER)

1  maintained a summary maintenance log for this vehicle

2  like all vehicles in its fleet; correct?

3      A    Yes.

4      Q    And it was a computerized database so that

5  somebody could punch in the VIN number and get a full

6  history of maintenance records to the extent that they

7  were, you know, maintained for any given bus; correct?

8      A    Yes.

9      Q    And Conrad was in charge of that department;

10  correct?

11     A    Yes.

12     Q    He would be a person who would have access

13  to the maintenance logs as well; correct?

14     A    Yes.

15     Q    And would be responsible for maintaining

16  them?

17     A    Yes.

18     Q    Would it be Conrad's, Mr. Thorwarth's, job

19  for someone in his department to note a maintenance

20  issue that was performed on a bus, the date, the

21  mileage, that type of thing, when it was done

22  in-house, is that the kind of thing that is put into

23  the summary maintenance log?

A.S.E. REPORTING SERVICE
(518) 458-1091

30

(G. MATTHEWS - PENDER)

1    A    Yes.

2    Q    And when it's sent out for some different

3 item, to say Detroit Diesel, how is the information

4 input in those situations?

5    A    Anything in the system would be entered by

6 Conrad.  It's manually entered.

7    Q    So do you know whether it's when he sends it

8 out to Detroit Diesel or when they bring it back,

9 maybe they give him a ticket that says we did one, two

10 and three, and that's when he enters what was done?

11    A    I don't know how he actually did that.

12    Q    But, in any event, it is your understanding

13 that even when work was done outside of house, so to

14 speak, Conrad would make some notation of that so it

15 was reflected in the summary maintenance log?

16    A    Yes.

17    Q    Was it the practice of Upstate Transit for

18 things like the odometer reading, which would be

19 posted at each maintenance entry, to maintain that

20 number as accurately as possible?

21    A    Yes.

22    Q    You understood the importance of the

23 accuracy of the odometer reading to track not only the

A.S.E. REPORTING SERVICE
(518) 458-1091

31

(G. MATTHEWS - PENDER)

1 maintenance history, but the usage history on the

2 vehicle; correct?

3      A    Yes.  It was as important as anything else

4 we entered in there.

5      Q    The summary maintenance log that

6 Mr. Thorwarth maintained for these vehicles of the

7 fleet, was that accessible to other people in the

8 company?

9      A    Yes.

10      Q    So, for instance, if you were going to sell

11 a bus or trade in a bus and the purchaser said, well,

12 I would like to see the vehicle's maintenance history,

13 you wouldn't necessarily have to have Conrad, you or

14 somebody else who maybe is involved in that

15 transaction could get into that database and print

16 that out?

17      A    Could.  Didn't happen that way.

18      Q    How did it happen typically?

19      A    Typically Conrad or our maintenance director

20 would talk to the inspector from, in that case, Setra,

21 go through the maintenance records, or offer up the

22 maintenance records to them.

23      Q    I have two faxed versions here.  I will mark

32

(G. MATTHEWS - PENDER)

1 them 5 and 6.

2          (Exhibits 5 and 6 were marked for

3 identification, respectively.)

4    Q    And these are multi-page documents.  Exhibit

5 5 is 22 pages.  And Exhibit 6 appears to be 10 pages,

6 that's 4 through 14.  And these purport to be faxes

7 received from Conrad Thorwarth by Darril King at

8 Setra.  5 is July 2005, a summary maintenance report.

9 This is from the dates of 11/1/98 through 8/1/2003.

10 So it's the more inclusive version.  And then --

11          MR. McDONALD:  I'm sorry, what were the

12          dates on 5?

13          MR. PENDER:  11/1/98 through 8/1/2003.

14    Q    Then Exhibit 6 is the summary maintenance

15 report for the same vehicle, but a more limited time

16 frame of January 1, 2002 to December 30th, 2003.

17 I'm going to basically ask you about the more

18 inclusive version, but I'm giving you this one because

19 Conrad sent that to us as well.  So that is 5 and 6.

20 And I will show those around to counsel.

21    A    What's the date they were faxed?

22    Q    They were printed, the more inclusive one in

23 July, and the less inclusive one was in June of last

A.S.E. REPORTING SERVICE
(518) 458-1091

33

(G. MATTHEWS - PENDER)

1 summer.

2      A      After this all --

3      Q      After the sale to Setra, yes.

4      A      After your --

5      Q      But before the asset transfer.

6      A      But after your sale?

7      Q      Yes.  Our sale was in December of 2003.  So
8 you've got 5 in front of you; correct?

9      A      Yes.

10      Q      Can you tell me, does that appear to be a
11 true and accurate summary maintenance report from
12 Upstate Transit related to the bus that we identified
13 by VIN number previously, at least as of the date that
14 it was printed out?

15      A      Yes.  And there's a big discrepancy in
16 dates, though, between July '05 and May when it was
17 sent.

18      Q      So --

19      A      I had sold the company since then, in
20 between that, so I don't -- I can't verify that this
21 is correct.

22      Q      You can't even verify that that is an
23 accurate copy of the summary maintenance log faxed by

A.S.E. REPORTING SERVICE
(518) 458-1091

34

(G. MATTHEWS - PENDER)

1 your maintenance supervisor?

2      A     No.  What I'm saying is when it was faxed,

3 it was after I owned this company.

4      Q     That's when it was faxed to me.  It was

5 faxed to me this year.  It has my firm's marking on

6 it.  Please ignore that.

7      It appears Mr. Thorwarth faxed that to a man

8 named Darril King in July of 2005, do you see that?

9      A     Yes.

10      Q     And it purports to show the entire

11 maintenance history of the bus in question from the

12 date that it was put into service up to and including

13 the date that it was, or near the date in 2003 when it

14 was traded in; correct?

15      A     Correct.

16      Q     Do you have any reason to doubt the accuracy

17 of that document or any of the entries in that

18 document?

19      A     No.

20      Q     Of course my highlighter, in copying, almost

21 darkens the entry in question I want to ask you about.

22 But on page 13 of the summary maintenance report,

23 there is an entry for November 26, 2001.  Well, first

A.S.E. REPORTING SERVICE
(518) 458-1091

35

(G. MATTHEWS - PENDER)

1 of all, let's start with the prior entry.

2     It appears that when it comes in 11/26/2001, that

3 consistent with the odometer readings on the prior

4 pages up to and including that date, it came in with

5 an odometer reading of 161,789 miles; correct?

6     A     Correct.

7     Q     And then there is an entry next to that that

8 says Webasto, W-E-B-A-S-T-O.  What does that mean?

9     A     Webasto Heater.

10     Q     So what does that mean to me?

11     A     Some type of service on the Webasto system.

12 It didn't go into detail as to what it was.

13     Q     Would that be something that Mr. Thorwarth

14 and his crew would do in house?  Or would that be out

15 of house?

16     A     I don't know.

17     Q     Can we agree that based on what appears to

18 be sort of the history of the dates of service of the

19 vehicle, if you look through them and the odometer

20 reading, there's a pretty consistent chronological

21 symmetry between the time and the odometer readings on

22 the bus --

23     A     Uh-huh.

A.S.E. REPORTING SERVICE
(518) 458-1091

36

(G. MATTHEWS - PENDER)

1     Q    -- showing a fairly consistent increase in

2 the odometer up to that date; correct?

3     A    Yes.

4     Q    And then there is an entry for the same

5 date, entry 14358, also November 26 2001.  It shows

6 that the mileage odometer is reset to 55,803 miles;

7 correct?

8     A    Correct.

9     Q    And the entry is instrument cluster

10 Prevost -- is that replaced -- changed odometer to

11 55,803?

12     A    Yes.  From my understanding, Prevost had a

13 recall on their odometers and they came in and changed

14 the whole instrument cluster.

15     Q    So Prevost is the manufacturer of the bus?

16     A    Uh-huh.

17     Q    Correct?

18     A    Correct.

19     Q    You all were notified of a recall on the

20 odometer.  And did they come to your place to do this

21 recall work or --

22     A    Yes.

23     Q    Okay.  So would there be a consistent entry

A.S.E. REPORTING SERVICE
(518) 458-1091

37

(G. MATTHEWS - PENDER)

1 for any of the other Prevost buses in the fleet?  Were

2 all the odometers changed on that date for this

3 recall?

4      A    I don't know.

5      Q    But, in any event, Prevost did that work,

6 advised Mr. Thorwarth, or someone in his department,

7 of that work and then he, Mr. Thorwarth, or somebody

8 in his department, made the entry that we just read;

9 correct?

10     A    Yes.

11     Q    So Mr. Thorwarth at least was aware that the

12 odometer had been reset to approximately a hundred

13 thousand or so, give or take, 105,000 miles?

14         MR. McDONALD:  I'm going to object.  He

15         can't say what Mr. Thorwarth was or was not

16         aware of.

17         You can answer, though, if you know.

18         MR. PENDER:  Okay.  I understand that.

19     Q    But I think we have established that it

20 would be -- that entry that we have read which

21 references the resetting of the odometer, would be an

22 entry made by somebody at Upstate Transit?

23     A    Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

38

(G. MATTHEWS - PENDER)

1    Q    Okay.  How is it that -- just as an

2 outsider, it would seem that you can't really reset

3 your odometer, even if the company did.  Why is it,

4 first of all, that they lowered it by 105,000 and

5 picked 55,000, or whatever, for the mileage?

6    A    I don't know.

7    Q    You have no idea whatsoever?

8    A    No.

9    Q    Did it concern you or the company at all

10 that the odometers were being lowered by 105,000 miles

11 and you did not know the reason why?

12   A    We weren't aware of it.

13   Q    You were not aware that was going to be

14 done?

15   A    No.

16   Q    I presume somebody at Upstate Transit was

17 notified that Prevost was coming out to do this recall

18 work?

19   A    Conrad.

20   Q    Did he come to you afterwards and say, you

21 know, I just want to let you guys know that Prevost

22 came out and lowered the odometer by 105,000?

23   A    Not that I'm aware of, no.

A.S.E. REPORTING SERVICE
(518) 458-1091

39

(G. MATTHEWS - PENDER)

1    Q    As far as you're concerned, were you

2 satisfied that he made that entry referencing that

3 lowering of the odometer and that that was all he did

4 in reference to notifying anybody in the company of

5 this resetting?

6    A    He had constant contact back and forth with

7 the manufacturers.  I can't speak for certainty, but

8 I'm sure he was trying to rectify what Prevost had

9 changed.

10    Q    Why?  Was the odometer set at 105,000 miles

11 high when you bought the bus?  I mean I'm trying to

12 understand why it is?

13    A    No.  It's just a mistake.  Somebody made a

14 mistake.

15    Q    What mistake?

16    A    Well, Prevost, when they set the new

17 instrument cluster, obviously made a mistake.

18    Q    Okay.  So basically they're coming out,

19 they're putting in a new odometer.  The old one says a

20 hundred sixty some odd thousand miles on it.  They put

21 a new one in, they reset it, they either reset it or

22 put one in that's got that reading, but whatever, the

23 one they leave in there says fifty-five thousand some

A.S.E. REPORTING SERVICE
(518) 458-1091

40

(G. MATTHEWS - PENDER)

1 odd miles and they leave it, and that was a mistake;

2 correct?

3     A    Yes.

4     Q    And that's, then, the obvious conclusion you

5 draw from that?

6     A    Yes.

7     Q    Do you know whether or not Mr. Thorwarth or

8 anyone at Upstate Transit tried to rectify that

9 mistake?

10    A    I don't want to speak for --

11    Q    Only what you know.  Only what you know they

12 did or that you heard that they did.

13    A    As far as I know in talking with Conrad, he

14 said that he was in contact with them to get this

15 rectified.

16    Q    And he never got --

17    A    That's all after the fact.

18    Q    You have seen that summary maintenance

19 report before; correct?

20    A    Yes.

21    Q    And you have seen that entry that shows that

22 discrepancy before?

23    A    Yes.

41

(G. MATTHEWS - PENDER)

1    Q    And you have discussed that with Conrad?

2    A    Yes.

3    Q    And his only response is that he tried to

4 get it rectified, but he never did?

5    A    Yes.

6    Q    Is that fair?

7    A    Yes.

8    Q    So now we move up from that entry in 2001 to

9 this sort of 2002 and 2003 time frame.  Where, if I

10 understand it correctly, Upstate Transit is looking to

11 replace a dozen or so buses in its fleet, move out the

12 Prevost and trade them in for these Setra buses, fair

13 statement?

14    A    Yes.  We shopped at every manufacturer.

15    Q    How is it that Upstate Transit decided to

16 purchase the Setra buses?

17    A    Setra came in and offered us the best

18 package deal.

19    Q    The best price on the new buses as well as

20 the best valuation of your used buses?

21    A    As a package, yes.

22    Q    That's part of the package, both sides of

23 the trade in?

42

(G. MATTHEWS - PENDER)

1    A    Yes, as a package.

2    Q    Who was it at Upstate Transit that was sort

3 of the point purchase for not only shopping this, but

4 doing the initial contacts with Setra?

5    A    Drew Tuller.

6    Q    What was Mr. Tuller's position at Upstate

7 Transit?

8    A    Vice president.

9    Q    And where does he work today?

10    A    I don't know.

11    Q    He is not with the Matthews Group anymore?

12    A    No.

13    Q    Do you know where he lives, if he's still in

14 this area?

15    A    Saratoga Springs I believe.

16    Q    Do you know who Mr. Tuller's initial contact

17 person was at Setra in connection with putting this

18 deal together and making the initial shop?

19    A    Darril King.

20    Q    And that's D-A-R-R-I-L K-I-N-G; correct?

21    A    Yes.

22    Q    Where is Darril King located, where was he

23 located?

A.S.E. REPORTING SERVICE
(518) 458-1091

43

(G. MATTHEWS - PENDER)

1    A    I believe he's in New Hampshire.

2    Q    If I said he was located in Massachusetts,

3 would you have any reason to disagree with that?

4    A    I don't know where he lives.

5    Q    So that the initial stages of the

6 transaction included Mr. Tuller and Mr. King putting

7 together a list of specifications for the vehicles,

8 the new vehicles that Upstate Transit wanted; correct?

9    A    Yes.

10    Q    And also working out or advising Setra that

11 you had a dozen or so Prevost buses that you wanted to

12 work in as a trade-in portion of the transaction;

13 correct?

14    A    Yes.

15    Q    And at some point did Setra come out to

16 inspect the dozen or so buses that they were going to

17 be taking in trade?

18    A    Yes.

19    Q    Were you present when that happened?

20    A    No.

21    Q    If the transfer documents appeared -- it

22 looks like they're all, most of them, at the end of

23 2003.  Do you know when, in relation to that that this

A.S.E. REPORTING SERVICE
(518) 458-1091

44

(G. MATTHEWS - PENDER)

1  inspection with trade ins took place?

2      A    No.

3      Q    Do you know who it was from Setra that came

4  to inspect the trade-in buses?

5      A    By name, no.

6      Q    Do you know if it was Darril King?

7      A    No, it wasn't Darril King.

8      Q    It wasn't Darril, okay.

9      A    Although he could have.  He probably was

10  part of the inspection, but...

11      Q    And did they come to Saratoga Springs or --

12      A    Yes.

13      Q    And --

14      A    It was a technical specialist from Setra.

15      Q    Did they meet with Conrad?

16      A    Yes.

17      Q    Would Conrad be the person probably best to

18  speak about what happened during this inspection, what

19  they went through, what was provided to them, etc.?

20      A    Yes.

21      Q    Have you talked to Conrad about what was

22  provided to Setra at the time of their inspection?

23      A    Yes.

45

(G. MATTHEWS - PENDER)

1    Q    What has he advised you that occurred during
2 the inspection?  What information did he provide to
3 Setra?

4    A    He offered up all maintenance records.  They
5 said they weren't interested, and he informed Darril
6 King that he believed one of the vehicles had a
7 mileage discrepancy, to look into it.  He gave me the
8 name of the person that did the inspection.  I don't
9 know who.

10   Q    So did he confirm that they indeed did
11 physically look at the buses and do some eyeballing of
12 the engines and things like that?

13   A    Yes.

14   Q    He offered up the summary maintenance
15 reports of the vehicle such as what we have looked at
16 in Exhibit 5, and the Setra people said we don't want
17 that, or we don't need it?

18   A    Yes.

19   Q    He advised Darril King, would that have been
20 during this visit, that one of the buses has a mileage
21 discrepancy?

22   A    Yes.

23   Q    And told Darril to look into that?

A.S.E. REPORTING SERVICE
(518) 458-1091

46

(G. MATTHEWS - PENDER)

1    A    Yes.

2    Q    And anything else?

3    A    No.

4    Q    So, again, as of late 2003, or whenever this

5 inspection took place, you know, perhaps a couple

6 years after this discrepancy first popped up, Conrad

7 Thorwarth was still aware of and recalled that there

8 was this mileage discrepancy on this bus that we are

9 talking about?

10    A    Yes.  Specifically he didn't reference the

11 bus, he just said there's a mileage discrepancy on one

12 of them.  I can't speak for Conrad.  That's what he --

13    Q    He may have been talking about one of the

14 other buses in the fleet, then?

15    A    As a general comment he made.

16    Q    It was not specific to this bus, as far as

17 you know, he made a comment about a bus that's really

18 unidentified at this point, it's one of the dozen or

19 so trade-in buses?

20    A    Yes.  It's 12 for 12.

21    Q    Okay.  Do you recall that Darril King and

22 Drew Tuller had a face to face meeting in actually

23 late 2002, about a year before the transaction finally

A.S.E. REPORTING SERVICE
(518) 458-1091

47

(G. MATTHEWS - PENDER)

1 commenced, to discuss the 12 for 12 transaction that

2 eventually took place?

3     A    There were several face to face.

4     Q    Do you know where those meetings took place?

5     A    The office, our office.  I know Setra came

6 out with a demo, took us all to dinner.  I went out.

7 Wined and dined us, everything else.

8     Q    Did Drew ever go to Darril's office in

9 Massachusetts to discuss any part of the transaction,

10 that you know of?

11     A    Not that I'm aware of.

12     Q    And indeed if Darril King's office was in

13 Massachusetts, at least Drew Tuller was communicating

14 by e-mail and telephone with Darril on a regular basis

15 about this transaction; correct?

16     A    Correct.

17     Q    You mentioned that Setra sort of wined and

18 dined you guys.  I mean, among other things, did

19 Darril King line up to get you guys Daytona 500

20 tickets, or something like that?

21     A    No.

22     Q    No?  Any type of tickets?  Race tickets or

23 anything like that, anything that you are aware of?

A.S.E. REPORTING SERVICE
(518) 458-1091

48

(G. MATTHEWS - PENDER)

1      A      No.  They wanted us to go to Germany.  Drew

2  went.  I didn't go.

3      Q      Setra paid for a certain group of people

4  from Upstate Transit to go to Ulm, Germany, to look at

5  the first batch of buses that were produced per the

6  specifications; correct?

7      A      Correct.

8      Q      And Drew and -- who else went on that trip?

9      A      As far as I know, just Drew.

10      Q      How about Katie Roeder, R-O-E-D-E-R?

11      A      Yes.  That's Drew's significant other, or

12  whatever, at the time.

13      Q      She was not an Upstate Transit employee?

14      A      No.

15      Q      Drew had a discussion with Darril King which

16  ended up with essentially Setra reimbursing Drew for

17  about $9,600 in air fare tickets for Drew and Katie

18  Roeder to go to Ulm, Germany; correct?

19      A      If you say so.  I don't know.

20      Q      I mean if I tell you that and if there's

21  e-mail showing that that was something that Drew and

22  Darril worked out in connection with Drew going over

23  to inspect those buses, it doesn't surprise you to

A.S.E. REPORTING SERVICE
(518) 458-1091

49

(G. MATTHEWS - PENDER)

1 hear that?

2    A    No, not at all.

3    Q    Let me show you what I'm marking as Exhibit

4 7.

5        (Exhibit 7 was marked for identification.)

6    Q    These are -- there are four pages.  Two of

7 them are dated February of 2003, appear to be

8 agreements to purchase that are, to my eye, for all

9 practical purposes identical with the exception of the

10 signatures at the bottom.  Why, I don't know.  I will

11 ask you that in a minute.  And terms and conditions of

12 sale associated with the agreement, and the pre-owned

13 coach trade-in agreement.  So those four pages, that's

14 Exhibit 7.  I will show those to you in a second, sir.

15 I will mark this as 8.

16    I'm going to mark the odometer disclosure

17 statement from Upstate Transit to Setra as Exhibit 8.

18 What I believe to be the certificate of title to the

19 vehicle, or a copy of it, as Exhibit 9.  Just so that

20 we can kind of move ahead a few documents here.  And

21 the power of attorney referencing this vehicle as

22 Exhibit 10.  But we will work with 7 first.

23        (Exhibits 8, 9 and 10 were marked for

A.S.E. REPORTING SERVICE
(518) 458-1091

50

(G. MATTHEWS - PENDER)

1 identification, respectively.)

2      Q    I guess my first question on Exhibit 7 is,

3 it appears that there are two signed agreements to

4 purchase, one that is signed by Darril King for Setra.

5 And whose signature is that on the first page for

6 Upstate Transit?

7      A    Drew Tuller.

8      Q    And then the second one is signed by, I

9 believe that's Pat Scully's signature for Setra?

10      A    Yes, it looks like it.

11      Q    And then whose signature for Upstate

12 Transit?

13      A    It was Bruce Matthews.

14      Q    And he is your uncle; correct?

15      A    Yes.  He is deceased.

16      Q    Okay.  Sorry to hear that.  What was his

17 position at the time?

18      A    What is the date on this?

19      Q    February 2003 is the date.  I can't tell you

20 when they were signed, but that is the date of the

21 document.

22      A    I'm not sure I can give you an answer unless

23 I look at the dates.  I'm trying to recant the dates

A.S.E. REPORTING SERVICE
(518) 458-1091

51

(G. MATTHEWS - PENDER)

1  in my mind.  But Bruce was chairman of the board of

2  the Matthews Group at one time.

3      Q    He had authority to sign a document like

4  that?

5      A    Yes.  I believe this was a ceremonial

6  signing at the -- there was a bus show, and Setra was

7  touting us buying these 12 buses to all their

8  customers to get future business.  And my uncle was

9  there and he signed it.

10     Q    That was really sort of the resigning.  It's

11 the same agreement that Darril King and Drew Tuller

12 had signed as well; correct?

13     A    Yes.

14     Q    And that's the 12 for 12 transaction

15 basically that we are talking about here?

16     A    Yes.

17     Q    And it's signed in February, so I assume

18 that means you've got 12 months or 10 months or so

19 built in for the buses, the new buses to be built and

20 delivered from Germany, and things like that?

21     A    Yes.

22     Q    Okay.  And the terms and conditions of sale

23 are a part of the transaction as well, correct, page

A.S.E. REPORTING SERVICE
(518) 458-1091

52

(G. MATTHEWS - PENDER)

1  3?

2      A    I'm sorry, what's that?

3      Q    The terms and conditions of the transaction

4  are part of it as well; correct?

5      A    Yes.

6      Q    And than the last page was about the

7  trade-in agreement; is that right?

8      A    Yes.

9      Q    It indicates that you were going to be the

10  signature, but in the end it looks like they crossed

11  out your name and Drew Tuller signed it; correct?

12      A    Correct.

13      Q    And that was February 12th of 2003; correct?

14      A    Correct.

15      Q    And that was some representation about the

16  pre-owned coaches that were going to be traded in to

17  Setra?

18      A    Yes.

19      Q    So among other things, it was represented to

20  Setra that there was the customer, being Upstate

21  Transit, was going to disclose in writing a vehicle

22  that had never been involved in an accident, you were

23  representing that it was in salable condition at the

A.S.E. REPORTING SERVICE
(518) 458-1091

53

(G. MATTHEWS - PENDER)

1 time, that the specifications of the coach haven't

2 been changed at all, the maintenance records would be

3 turned in with the trade, systems will be working,

4 etc., etc.; correct?

5           MR. McDONALD:  Just if you could show

6           him the paper again before he answers.

7     Q     Okay.  Take that back again.  I'm sorry.

8     A     Yes.

9     Q     And it was Upstate Transit's intent that

10 Setra would rely on what they were telling them and

11 allowing them to see in these buses in terms of how

12 Setra was going to valuate the trade-in for purposes

13 of this transaction; right?

14    A     No.

15    Q     You did not intend for them to rely on what

16 you were telling them?

17    A     They didn't care.

18    Q     Okay.  But you told them -- they didn't

19 care?

20    A     These papers were all done after the fact.

21    Q     Why didn't they care?

22    A     They cut a deal.  Because they wanted to get

23 12 buses into this market place, and they obviously

A.S.E. REPORTING SERVICE
(518) 458-1091

54

(G. MATTHEWS - PENDER)

1 were offering a great deal to do it, and they took in

2 12 very good coaches.

3    Q    And they gave you guys credit of like two

4 hundred thirty some thousand?

5    A    Same amount across the board for each coach

6 whether the mileage was this or that, or whatever.  It

7 was the deal they cut.

8    Q    So then Exhibit No. 8 is the odometer

9 disclosure statement for the trade-in for the bus in

10 question, the 12717 bus; correct?

11    A    Uh-huh.  Yes.

12    Q    I think that's the original copy there;

13 correct?

14    A    Appears to be, yes.

15    Q    Who is that signed by?

16    A    Drew Tuller.

17    Q    And, again, Drew Tuller at the time was a

18 vice president of Upstate Transit; correct?

19    A    Yes.

20    Q    He certainly had authority to sign a

21 document like that; correct?

22    A    Yes.

23    Q    And regardless of what Setra wanted to hear,

55

(G. MATTHEWS - PENDER)

1 was willing to hear about any of these buses, that

2 appears to me to be a statement of what Mr. Tuller

3 understood the odometer on the bus in question to read

4 as of the date of transfer; correct?

5     A    Yes.  To the best of his knowledge as it

6 says here.  I'm sure the document was just put in

7 front of him as part of the package deal.

8     Q    Okay.  So are you saying that -- well, first

9 of all, are you saying that the number that he wrote

10 in here, 151,981 miles, was that accurate as of the

11 date of transfer?  I mean --

12     A    To the best of his knowledge obviously.  I

13 don't know who wrote the number in there.  It's in

14 different pen than any of the other pens.  I don't

15 know when it was.

16     Q    Do you know what the initials are next to

17 the number?

18     A    Darril King I think.  I can't -- I don't

19 know what that says D -- DC?

20          MR. McDONALD:  If you don't know, just

21          say you don't know.

22     A    I don't know.

23     Q    You don't know, that's fine.

A.S.E. REPORTING SERVICE
(518) 458-1091

56

(G. MATTHEWS - PENDER)

1    A    And that's in different pen.

2    Q    Right, and that is in different pen than the

3 two signatures on there, correct, it would appear?

4    A    Correct.  And these two appear to be

5 different.

6    Q    Which two?

7    A    The number and the initials.  The initial

8 appears to be darker than the number, so I don't know.

9    Q    So this says that --

10    A    That looks like that.  (Indicating)

11    Q    Well, let's look at this down here.  Buyer

12 signature -- I'm sorry, seller's signature, Upstate

13 Transit, Inc., that blue ink there, that is, as far as

14 you know, Drew Tuller's signature?

15    A    As far as I know, yes.

16    Q    It says VP at the end; correct?

17    A    Correct.

18    Q    So when he signed this document, if he

19 signed it and he knew it to be true, what he was

20 telling Setra, the buyer, was that the odometer on the

21 bus now read 151,981 miles as of December 17th,

22 2003; correct?

23    A    Yes, I believe it was.  You know, these,

A.S.E. REPORTING SERVICE
(518) 458-1091

57

(G. MATTHEWS - PENDER)

1 probably all 12 of these were handed to him at once to

2 sign.  I don't know who wrote the numbers in there,

3 though.

4       Q     Okay.  Would it be Mr. Tuller's practice to

5 sign a document like that without having a number

6 written in?

7       A     That's the first one he ever did.

8       Q     That's the first?

9       A     For us -- with us.

10      Q     So you don't know what his practice would

11 be?

12      A     No.

13      Q     You certainly wouldn't expect him to sign a

14 document without verifying that that's exactly what

15 the odometer read, would you?

16      A     I wouldn't expect it.  But I can understand

17 it.

18      Q     Why?

19      A     It's a group of 12 buses, and it was a 12

20 for the 12 like exchange.

21      Q     So you would find that -- Upstate Transit

22 would find that acceptable, for him to transfer

23 ownership of a bus without checking what the odometer

58

(G. MATTHEWS - PENDER)

1 reads before signing a document like that?

2      A    Well, I don't find it acceptable, but I

3 certainly can see how a mistake could be made.

4 Certainly was no intent.

5      Q    But we agree that that is not the actual

6 mileage, the actual mileage on the bus?

7      A    Obviously the maintenance reports show

8 otherwise.

9      Q    So the number that is provided there is at

10 least, if we compare it to the maintenance records, at

11 least off by 105,000; correct?

12      A    I would say only off by that much.

13      Q    And the maintenance records, as you have

14 indicated, which were offered to Setra were also

15 available to Mr. Tuller; correct?

16      A    If he chose to look at them, yeah.

17      Q    Do you know whether or not Mr. Tuller

18 actually did check either with Conrad or with the

19 maintenance database itself --

20      A    No.

21      Q    -- and made himself aware that there was

22 this discrepancy?

23      A    Obviously didn't.

59

(G. MATTHEWS - PENDER)

1    Q    Because he did not check off, for instance,

2 the box that says, I hereby certify that the odometer

3 reading is not the actual mileage warning odometer

4 discrepancy.  You would have expected him to check

5 that box if he had actually confirmed that there was a

6 discrepancy?

7    A    Yes.

8    Q    And if this were accurate at the time, that

9 box should have been checked off, can we agree?

10    A    Or the mileage be adjusted to what it was --

11    Q    One of the two?

12    A    -- by Prevost.  Yeah.

13    Q    Do you know that these documents, or do you

14 know whether these documents, the agreements to

15 purchase, the odometer disclosure statement in

16 connection with this transaction were at least faxed

17 to Darril King at his office?

18    A    I don't know that.

19    Q    Do you have any reason to disagree that that

20 occurred?

21    A    No.  It's my understanding he was there,

22 though, so...

23    Q    At the time of the signing of the odometer

A.S.E. REPORTING SERVICE
(518) 458-1091

60

(G. MATTHEWS - PENDER)

1 transfer or -- I realize he signed it.

2      A      The original signatures, so I'm assuming

3 that they were both present.

4      Q      Right.  So this signature for Setra of North

5 America, as far you know is Darril King's signature?

6      A      As far as I know.

7      Q      Do you know whether or not Upstate Transit

8 provided any other documents to -- strike that.  I

9 have to ask you about the title first.

10      The next, Exhibit 9, is a title purchase,

11 purports to be a certificate of title for the vehicle

12 in question with the 12717 VIN number; is that

13 correct?

14      A      Yes.

15      Q      And was there some problem locating from the

16 finance company the original title for this bus?  Do

17 you recall that?

18      A      No, I don't recall.

19      Q      This says issued April 14th of 2004, which

20 would be at least four months or so after the odometer

21 trade-in document is signed.

22      Let me show you a letter that was in there, too.

23 I won't mark it yet unless you find it.  Who is

A.S.E. REPORTING SERVICE
(518) 458-1091

61

(G. MATTHEWS - PENDER)

1 Charles Bosalana?

2      A      No idea.

3      Q      Oh, he is with M & T Bank.  Is M & T Bank

4 the finance company?

5      A      They were on those coaches, yes.

6      Q      So this appears to be the finance company

7 sending to Setra a copy of the title, because the

8 finance held the title?

9      A      Right.

10      Q      Exhibit 9 appears to be a certificate of

11 title from New York State dated April of 2004 showing

12 an odometer reading of 16 miles.

13      Do you know how it is that the date would be

14 April 14th, or the odometer reading as of April 14th

15 would be 16 miles?

16      A      No idea.  Somebody obviously made a mistake.

17 I have no idea.

18      Q      The Prevost buses that Upstate Transit

19 purchased around the 98-99 time frame, I assume,

20 because the company had been in existence since the

21 eighties, that wasn't the first fleet of buses that

22 you had; correct?

23      A      No.  It had been -- no.

A.S.E. REPORTING SERVICE
(518) 458-1091

62

(G. MATTHEWS - PENDER)

1     Q     And had the company been involved in prior

2 transactions where it traded in or sold buses in its

3 fleet from time to time?

4     A     We did a -- every five years we would do a

5 fleet replacement, yes.

6     Q     So transactions such as this where you would

7 be trading in or maybe one bus sold, or whatever it

8 would be, the company was at least sophisticated in

9 the transaction of either selling or trading in a used

10 bus; is that a fair statement?

11              MR. McDONALD:  I object to the use of

12          the word sophisticated.  But you can answer

13          it.

14     A     Upstate Transit?

15     Q     Yes.

16     A     No.  Every five years.  Once.

17     Q     So if the company was in existence since the

18 early eighties, this would be, what, the fourth fleet

19 maybe?

20     A     Different people.  Totally different people.

21     Q     I don't understand different people.

22 Different people would be involved?

23     A     Yes.

63

(G. MATTHEWS - PENDER)

1    Q    But the same company is what I'm saying?

2    A    Yes.

3    Q    This was not the first bus that you had ever

4 traded in; correct?

5    A    No.

6    Q    And the odometer disclosure statement

7 references generally, not specifically, but Federal

8 and State Law require disclosing the odometer upon

9 transfer of ownership; correct?

10    A    Correct.

11    Q    So the company was aware, because you had

12 done this on previous occasions, that these were

13 Federal and/or State Laws that dealt with the issue of

14 the odometer reading on the transfer of the vehicle?

15 You understood that; correct?

16    A    Yes.  To the best of our knowledge, that's

17 the number that came off of the odometer.

18    Q    And if you read the summary maintenance log,

19 it may very well have been 151, because it was --

20    A    Right.  That's what I'm saying.

21    Q    By the time it got from 2001 to 2003?

22    A    Right.  I think he -- you know, as far as

23 Drew Tuller, I think he signed what he thought was

A.S.E. REPORTING SERVICE
(518) 458-1091

64

(G. MATTHEWS - PENDER)

1 correct because that's what came off of there.

2            MR. McDONALD:  Don't answer for Drew,

3        just what you know.

4    Q    Is Drew Tuller's true name James Tuller?

5    A    Yes.

6    Q    The summary maintenance log that Thorwarth

7 printed for my client in August of 2003, about four

8 months before Drew signed that document, Exhibit 8,

9 the last entry is July of 2003, July 30th, the end

10 of July, and it has 132,662.  So would that be within

11 reason that the bus would have been still in operation

12 at that point in the fleet and you might have incurred

13 another twenty or so thousand miles in the last

14 quarter of the year basically?

15    A    Yes.  Busy quarter.  Yeah.

16    Q    Would there have been continued maintenance

17 typically done on the vehicle?  So if we ran a summary

18 maintenance log for the vehicle after the last date on

19 this up to the date of sale, there probably would be a

20 few more entries; correct?

21    A    Yes.

22    Q    Lastly I will mark here your affidavit that

23 has been submitted in connection with the motion to

A.S.E. REPORTING SERVICE
(518) 458-1091

65

(G. MATTHEWS - PENDER)

1 dismiss as 11.

2          (Exhibit 11 was marked for identification.)

3     Q     And this is one of the pages filed in

4 connection with the lawsuit.  It purports to be your

5 affidavit in this case.  I have marked it as Exhibit

6 No. 11.  Just refresh yourself with what is in that

7 document and I will ask you a few questions about

8 that.

9          Prior to signing this affidavit, can you tell me

10 the extent of what sort of -- investigation is a fancy

11 word -- what you did to sort of find out about this

12 situation and find out about who you talked to before

13 providing the information that is in this affidavit?

14     A     The whole thing is all after the fact, so I

15 don't --

16     Q     Well, I understand that.  I'm just

17 wondering, for instance, I know Drew Tuller does not

18 work for you anymore.  Did you call him up and say,

19 you know, Drew, there's a situation going on, can you

20 tell me some things about your, you know,

21 communications with Setra, or anything like that?

22     A     No.

23     Q     Did you talk to Conrad Thorwarth at all?

A.S.E. REPORTING SERVICE
(518) 458-1091

66

(G. MATTHEWS - PENDER)

1     A     Recently.

2     Q     And was that in connection more with the

3 summary maintenance report issues?

4     A     Yes.

5     Q     You reference in here correspondence

6 specifically, and I will ask you if there are e-mails,

7 and I want you to assume for purposes of this question

8 that Darril King had an office in Massachusetts at the

9 time of this transaction, so I'm asking you to assume

10 that.  If it's not the case, then these questions will

11 be worthless anyway.

12       But assuming his office was in Massachusetts at

13 the time, do you know whether or not Darril sent any

14 correspondence or documents from his office through

15 the mail to Upstate Transit?

16             MR. McDONALD:  Just note my objection

17             to the assumption that his office is in

18             Massachusetts.  You can answer, though.

19     A     No, I do not.

20     Q     So when you say here that all

21 correspondence --

22     A     The best of my knowledge, Darril King was a

23 sales rep, could have lived anywhere, didn't matter.

67

(G. MATTHEWS - PENDER)

1 The deal was done between us and the corporate office

2 in Greensboro, North Carolina.

3    Q    He was a Setra sales rep?

4    A    Yes.  Just a sales rep who worked out of his

5 home, or whatever.

6    Q    I understand that.  But when you say that

7 all correspondence -- well, strike that.  Do you know

8 whether or not Mr. King sent e-mails and made

9 phonecalls from his office, his sales rep office, to

10 Mr. Tuller or others at Upstate Transit in connection

11 with this?

12    A    No, I do not.

13    Q    Certainly you know that Darril was the point

14 person for this investigation, so it wouldn't surprise

15 you to learn that there were numerous phonecalls?

16    A    Yes.  And I mean Drew Tuller used to work

17 for Setra.  He was the national sales manager.  So my

18 assumption is he was in direct contact with Pat Scully

19 on this deal.  It was a key deal to Setra.  So whether

20 there were communications or not, I don't know where

21 or when or --

22    Q    And you cannot deny, or you won't deny that

23 there were e-mails or phonecalls from Darril King to

A.S.E. REPORTING SERVICE
(518) 458-1091

68

(G. MATTHEWS - PENDER)

1 your company?

2      A     No.

3      Q     Because you don't know; correct?

4      A     Right.

5      Q     Have you ever heard of Mr. Friedmann's

6 client, Limoliner?  Did you ever know of them?

7      A     Not until we were served notice from you

8 guys.

9      Q     You never sold any buses to that company,

10 have you?

11      A     Not that I'm aware of.

12      Q     Other than the documents that we have

13 discussed, the title, the odometer trade-in and that

14 agreement to purchase with its terms and conditions in

15 the trade-in sheet, were there any other documents

16 provided to Setra in relation to this particular bus,

17 the one in question, 12717, first of all, any other

18 documents that you are aware of?

19      A     I'm not aware of.

20      Q     Any that in anyway limited or modified any

21 warranties, or anything like that, in relation to this

22 transaction?

23      A     Not that I'm aware of.

A.S.E. REPORTING SERVICE
(518) 458-1091

69

(G. MATTHEWS - PENDER)

1     Q     Did you understand that Setra was a seller

2 of both new and used buses?

3     A     Yes.

4     Q     You understood that Setra was going to

5 market and resell these buses that you were trading

6 in?

7     A     Yes.

8     Q     Do you know whether or not Mr. Thorwarth or

9 anyone at Upstate Transit ever would have occasion to

10 download or otherwise check what is called the ECM,

11 the bus computer?

12     A     I don't think he would do that.  I would

13 assume that Detroit Diesel or Prevost would do that.

14     Q     Are you aware or have you found out through

15 your discussions with Thorwarth that there were any

16 changes ever made to the ECM of any type?

17     A     Not that I'm aware of.

18     Q     Has your company ever been a party to a

19 lawsuit in Massachusetts before?

20     A     No.

21     Q     The business of Upstate Transit, slash,

22 Upstate Tours when it was within the Matthews Group

23 and including this time frame that we are talking

A.S.E. REPORTING SERVICE
(518) 458-1091

70

(G. MATTHEWS - PENDER)

1 about of 2003 up to the time of the asset transfer,

2 you have described the business as charter tours and

3 privately hired coach tours; correct?

4      A      Privately hired would be charter.  And tours

5 would be we arranged it.

6      Q      That was the sum and substance of that

7 company's business at that time; correct?

8      A      Correct.

9      Q      And so in terms of generating income for the

10 company, would it be correct to say that the revenue

11 that that company generated was through its tours and

12 charters?

13     A      And our transit liner run here in New York

14 State.

15     Q      And do you know what percentage of the

16 revenues on an annual basis would have been generated

17 from some of these trips that we talked about into

18 Massachusetts?

19     A      Very small.  Very, very small percentage.

20     Q      Do you have any estimate?

21     A      Less than one percent.

22     Q      What other states or areas would the

23 remainder of the 99 percent of revenues come from?

A.S.E. REPORTING SERVICE
(518) 458-1091

71

(G. MATTHEWS - PENDER)

1    A    New York; New Jersey; Connecticut; Rhode

2  Island; Vermont; New Hampshire; Maine; Montreal,

3  Canada, and west.  We went all the way out to

4  California.

5    Q    In connection with trips into other places

6  on the east coast, was it a frequent and regular

7  practice for Upstate Transit coaches to be operating

8  on Massachusetts roadways on their way to whatever

9  destination it might be in New Hampshire or otherwise?

10    A    For the northern -- I guess Maine and New

11  Hampshire and Massachusetts would make sense.

12    Q    When there would be an overnight trip in

13  Massachusetts, your drivers would stay with the group

14  in Massachusetts; correct?

15    A    Correct.

16    Q    Does your company direct, or did your

17  company direct any advertisement into the State of

18  Massachusetts?

19    A    No.

20    Q    So you have a web site that is not state

21  specific, it's just to anybody in the world as we now

22  know through the internet.  But it was not the

23  practice of the company to distribute anything in

A.S.E. REPORTING SERVICE
(518) 458-1091

72

(G. MATTHEWS - PENDER)

1 writing or in any magazines, or anything like that,

2 that would be disseminated in Massachusetts?

3     A     No.

4     Q     Did the company take on private charters of

5 groups from Massachusetts?

6     A     Not that I'm aware of.

7     Q     On occasions when you would make trips into

8 Massachusetts for things like, you know, a Red Sox

9 game or, you know, the trip to Salem, or something

10 like that, were there any companies or ticket brokers

11 or anything that you would regularly work with in

12 setting up those trips?

13     A     I'm not aware of anyone in particular, any

14 one particular company.

15            MR. McDONALD:  I just object to the use

16            of Salem.  I think he testified he is

17            unaware of any trips to Salem.

18     Q     Well, we looked at some on the web site.

19 You have no reason to disagree that at least it was

20 advertised that it was going to Salem, whether it went

21 or not, you have no --

22     A     Going to Salem?

23     Q     Going to Salem.

A.S.E. REPORTING SERVICE
(518) 458-1091

73

(G. MATTHEWS - PENDER)

1    A    Not advertising to people in Massachusetts.

2    Q    No, no, I understand that.  But trips --

3 Salem is in -- you are talking about Salem,

4 Massachusetts; right?

5    A    Right.

6    Q    And you say there was not any one company.

7 Well, for instance, let's just take the Red --

8    A    I didn't say that.  I said I wasn't aware.

9 I'm not sure.  I have people that would handle that.

10    Q    I mean all I'm trying to do is find out --

11    A    I know.

12    Q    If I wanted to go to a Red Socks game, I

13 have to call an important guy like Mr. Friedmann.  But

14 if you've got a bus with like 90 people, maybe you go

15 through somebody or maybe you call the Red Socks, I

16 don't know.  That's what I want to know.  Do you know?

17    A    No, I don't know.

18    Q    And Salem, you know, it's sort of the

19 Halloween Haunting Tour, I assume that's a tour that's

20 ongoing in Salem and that you sort of integrate your

21 group into.  Do you call the people in Salem that are

22 running that and say we are going to be bringing in a

23 bus of a group of people?

A.S.E. REPORTING SERVICE
(518) 458-1091

74

(G. MATTHEWS - PENDER)

1    A    The girl that handles our tours would handle
2 that.

3    Q    What is her name?

4    A    Christine Kulls, K-U-L-L-S.

5    Q    Is she still with the company?

6    A    She is with the new company.

7    Q    Matthews Group or --

8    A    No.  She's with the Upstate.

9    Q    The Brown Coach group?

10    A    Yes.

11    Q    Did Tuller stay with them, is that where he
12 is?

13    A    When he left us, he went with them.  And
14 then he's since --

15    Q    He is not even with them anymore?

16    A    I think he does some work for them.

17    Q    Do you know whether or not Brown Coach
18 assumed the liabilities in this asset transfer or if
19 they strictly purchased your assets?

20    A    They purchased our assets.

21    Q    Not your liabilities?

22    A    Right.

23    Q    What about things like, would there have to

A.S.E. REPORTING SERVICE
(518) 458-1091

75

(G. MATTHEWS - PENDER)

1 be arrangements made in Massachusetts at the

2 destination, if it were not an overnight, for parking

3 the buses?  Or were there public bus lots available

4 that you could just access?

5        A     For overnight?

6        Q     Or for day trips, either one.

7        A     For day trips, the facilities made parking

8 available for buses.

9        Q     So some contact would be made with, for

10 instance, either the Red Socks or if it was going to

11 be a shopping trip, some -- what would it be, some

12 Chamber of Commerce there or --

13       A     No.  I'm not real sure.

14       Q     But you don't just drive one or two of these

15 buses loaded with people in the city and hope to find

16 a place to park?  I mean that's all prearranged;

17 right?

18       A     Yes.

19       Q     Where they're going to eat when they go on

20 the trip, where the buses are going to park, what

21 different tours they're going to access or tickets

22 they're going to have, is all prearranged before the

23 trip sets forth, and somebody like Christine Kulls

76

(G. MATTHEWS - PENDER)

1  would be the person that would be involved with that?

2      A    Yes.

3           MR. PENDER:  That's all I have.  Do you

4           want to take a break?

5           MR. McDONALD:  Yes, take a break for a

6           minute.

7                    (Recess)

8  BY MR. FRIEDMANNN:

9      Q    Hi.  Mr. Matthews, my name is John

10  Friedmann, and I represent Limoliner in this matter.

11  I have a few follow-up questions on what you have

12  already been asked and a couple of my own areas to ask

13  you some questions about.  If I ask a question and you

14  do not understand it, please let me know, because I

15  tend to be even less clear than Mr. Pender was when I

16  ask you a question.

17      So, first, what did you do in preparation for

18  today's deposition?

19      A    Look at the documents that were given to us

20  and talked with Conrad, our maintenance director at

21  the time, tried to research documents that, you know,

22  back prior to the sale.

23      Q    When you say you looked at documents, what

                A.S.E. REPORTING SERVICE
                   (518) 458-1091

77

(G. MATTHEWS - FRIEDMANN)

1  documents are you referring to?

2      A    The large group that we just got, which is

3  all the litigation that's going on now and previous

4  litigation.

5      Q    Some pleadings from the case?

6      A    Yes.

7      Q    Okay.  And you mentioned that you spoke to

8  somebody also?

9      A    Yes.  Conrad.

10     Q    What was Conrad's position with your

11  company?

12     A    Maintenance director.

13     Q    Did you speak to anybody else in preparation

14  for today's deposition, obviously other than your

15  counsel?

16     A    Did speak with Drew Tuller in a meeting with

17  counsel.

18     Q    And what is Mr. Tuller's position, or what

19  was his position?

20     A    Was vice president.

21     Q    He is no longer employed by your company?

22     A    No.  When we sold the assets, he went with

23  the business.

A.S.E. REPORTING SERVICE
(518) 458-1091

78

(G. MATTHEWS - FRIEDMANN)

1    Q    So at the time that you had the discussion

2 with yourself and Mr. Tuller, was that with counsel

3 present or was that not with counsel present?

4    A    Counsel was present.

5    Q    And when did that take place?

6    A    A week ago.

7    Q    What were the subjects that were discussed?

8    A    Just background information.

9    Q    What type of background information?

10          MR. McDONALD:  Just for the moment to

11          verify, you are seeking information related

12          to his conversation with Mr. Tuller and not

13          with counsel?

14          MR. FRIEDMANNN:  Correct.

15    A    I'm trying to remember specifically.  About

16 the transaction, the deal for 12 buses for 12 buses

17 and his conversation with Darril King.

18    Q    The discussion with Conrad, was there just

19 one discussion with Conrad or was there more than one?

20    A    There were a few.  When I first got the

21 notification of this, I went and talked to him, tried

22 to talk to him.  He -- you need to understand, it's a

23 little difficult for me now, I don't own the company,

A.S.E. REPORTING SERVICE
(518) 458-1091

79

(G. MATTHEWS - FRIEDMANN)

1 they're not my employees, and the new employer doesn't

2 really want them talking about it.

3      Q    All right.  So you spoke to Conrad once or

4 more than once?

5      A    Twice.

6      Q    What were the subjects that you discussed

7 with Conrad?

8      A    Asked him about regarding the maintenance

9 records, because that was the first time I had seen

10 them, and --

11      Q    Any other subjects?

12      A    No.  Basically that was the initial

13 conversation.  And he offered up information about his

14 contacts and what transpired, I mean from his

15 recollection.

16      Q    What is your -- I'm sorry.  Were there any

17 other people that you spoke with regarding today's

18 deposition and the subject matter of the litigation?

19      A    I did speak with Darril King when I first

20 got the notice and asked him what this was about.

21      Q    What did he tell you?

22      A    He was vague and didn't want to get

23 involved.

80

(G. MATTHEWS - FRIEDMANN)

1     Q     Did you call him or did he call you?

2     A     I called him.

3     Q     And where did you call him?

4     A     His cellphone I guess.  I think I got that

5 from Conrad.

6     Q     In terms of business records of Upstate,

7 from the time frame that you were one of the owners of

8 Upstate, where were those business records maintained?

9     A     At Geyser Road.

10     Q     I'm sorry?

11     A     Geyser Road.

12     Q     And what is at Geyser Road currently?

13     A     Upstate Tours of Saratoga, LLC, that we

14 don't own.

15     Q     So you turned over to them, as part of the

16 asset sale, all of the background records and

17 materials related to the prior business operations?

18     A     Yes.

19     Q     And that took place slightly over a year

20 ago?

21     A     Yes.

22     Q     What type of business records were turned

23 over to them?

A.S.E. REPORTING SERVICE
(518) 458-1091

81

(G. MATTHEWS - FRIEDMANN)

1    A    Whatever was in the agreement.  I know we

2 still have records in boxes from years back that they

3 were not interested in.

4    Q    What types of business records do you have

5 from years back that they were not interested in?

6    A    Well, anything that was in the files that

7 they didn't want.

8    Q    And where are those records maintained

9 physically?

10    A    At Exit 29 -- at 2900 Route 9.

11    Q    At your business location?

12    A    Yes.

13    Q    Are they segregated in some way, those

14 business records?

15    A    No.  It's a mess.

16    Q    Would there be any of the logs that would

17 show what trips were run and what dates?

18    A    There may be.  I can't tell you whether

19 there is or not.  I don't know.

20    Q    Did you take any steps to determine that

21 before coming for your deposition?

22    A    No.  Like I said, it's very difficult to

23 pull all those records.

A.S.E. REPORTING SERVICE
(518) 458-1091

82

(G. MATTHEWS - FRIEDMANN)

1    Q    What about things like telephone bills, does

2 your company have a policy for how many years it

3 maintains its business records, its bills?

4    A    Yes, we do.  I don't know specifically how

5 many years we kept them.

6    Q    Would that indicate what phone number you

7 would be contacting people at involved in this

8 transaction?

9    A    If such records exist, yes.

10    Q    Did the company have a specific provider of

11 long distance phone services?

12    A    I'm sure we did, yeah.

13    Q    Do you know who that was?

14    A    No, during that time I don't know.

15    Q    What about cellphones, do you sill have

16 cellphones from prior to the sale of the business?

17    A    Whose cellphone?

18    Q    Your own let's start with.

19    A    Yeah, sure.

20    Q    Is it still the same number?

21    A    Yes.

22    Q    So you would have access to the records from

23 prior to the business sale?

A.S.E. REPORTING SERVICE
(518) 458-1091

83

(G. MATTHEWS - FRIEDMANN)

1      A      Sure.

2      Q      Were there any other employees that were

3  given business cellphones that would indicate to what

4  phone number or what locations they were placing

5  calls?

6      A      Yes.

7      Q      Who would those other employees be?

8      A      Drew Tuller.  That would probably be it.

9      Q      You mentioned the name of a woman.  Was it

10 Christine Kulls?

11     A      Kulls.

12     Q      What was her title again?

13     A      She handled the charters and tour bookings.

14     Q      And she is the one that would have placed

15 calls to locations such as Fenway Park or Salem to

16 arrange whatever services were going to be provided at

17 that location?

18     A      Yes.

19     Q      And you just do not know who she contracted

20 with?

21     A      No.

22     Q      Or who she contacted; is that correct?

23     A      Correct.

A.S.E. REPORTING SERVICE
(518) 458-1091

84

(G. MATTHEWS - FRIEDMANN)

1    Q    But you do know that she would have to buy,

2 for example, the bus parking permits if she was --

3    A    I don't know that to be the case.  I don't

4 know that exactly.  I don't know how she arranged for

5 that.

6    Q    Let's start with the Salem trips first.

7 These were done primarily right around the Halloween

8 season; is that correct?

9    A    Yeah.  That's --

10    Q    The haunted trips?

11         MR. McDONALD:  If you don't know --

12    A    I don't know.

13    Q    Okay.  You are aware, aren't you, that your

14 company did run trips to Salem to see the haunted

15 houses and to visit things like the Salem Witch

16 Museum?

17    A    It appears so, yes.

18    Q    And you were aware that in Salem, in order

19 to park a bus, you needed to get a bus parking permit

20 for the municipal lot; correct?

21    A    I'm not aware of that.

22    Q    When you and your tour went to Salem to go

23 to the Witch Museum, had they pre-purchased the

A.S.E. REPORTING SERVICE
(518) 458-1091

85

(G. MATTHEWS - FRIEDMANN)

1 tickets for admission?  Or was it done at the door?

2      A    I don't know.

3      Q    Which restaurant did they eat at?

4      A    I don't know.

5      Q    Which other stops were there in Salem other

6 than the Witch Museum?  Did they go to the Gables

7 Museum?

8      A    I don't know.

9      Q    Would your tour operators at times need to

10 purchase fuel for your vehicles while they were on the

11 road?

12      A    It would depend.

13      Q    If they were --

14      A    If they were leaving from here fully fueled,

15 they wouldn't need fuel, no.

16      Q    Were your buses ever in need of service

17 while en route?

18      A    It's possible.

19      Q    Do you have any recollection of that ever

20 happening in Massachusetts?

21      A    No.

22      Q    Do your buses have passes to go through

23 tollgates?  Or do they have to pay as they go?

A.S.E. REPORTING SERVICE
(518) 458-1091

86

(G. MATTHEWS - FRIEDMANN)

1     A     I don't know.

2     Q     But they certainly would pay tolls if they

3 did not have prepaid passes?

4     A     Yes.

5     Q     Okay.  Did your buses usually and regularly

6 come equipped with electronic toll paying devices?

7     A     I don't know.

8     Q     In order to perform transit services in

9 Massachusetts, did you have to have any licensing of

10 your buses for the tours?

11     A     Rephrase that?

12     Q     Did you need to receive any permit licensing

13 or passes of any nature from the Commonwealth of

14 Massachusetts or any of its subdivisions --

15     A     No.

16     Q     -- in order to operate your vehicles and the

17 tours in Massachusetts?

18     A     Not that I'm aware of.  We operate under New

19 York State, which is good for all 50 states.

20     Q     Did you have to obtain any special

21 registrations if you were to call to park your buses

22 in the bus area at Fenway Park?

23     A     I don't know.

A.S.E. REPORTING SERVICE
(518) 458-1091

87

(G. MATTHEWS - FRIEDMANN)

1     Q     Did you ever go on any of those trips?

2     A     No.

3     Q     You don't like the Red Socks?

4           MR. McDONALD:  I object.

5     Q     So you never personally took any of the

6 tours to Massachusetts?

7     A     No.

8     Q     So your answer is yes, you never did that?

9     A     Yes, I never did that.

10    Q     Okay.  I do not mean to be rude, it's just

11 on the transcript it will look funny.

12    Can you tell me also, sir, what is your

13 educational background?

14    A     I have a bachelor's degree from Springfield

15 College in Massachusetts, a BS.

16    Q     What year did you get that from Springfield

17 College?

18    A     1984.

19    Q     During the past five years, what has been

20 your full-time employment?

21    A     Past five years?

22    Q     Yes.

23    A     President of Matthews Buses, vice president

A.S.E. REPORTING SERVICE
(518) 458-1091

88

(G. MATTHEWS - FRIEDMANN)

1 of Matthews Group.  During that time I was the

2 president of Upstate.

3      Q     And prior to that position, did you hold any

4 other full-time positions?

5      A     Yes.  I was vice president of Matthews

6 Buses.

7      Q     How far back does your employment with

8 Matthews or Upstate or any of its related entities?

9      A     Upstate was in 2003 I believe.

10     Q     You began --

11     A     My uncle retired and I stepped in during his

12 retirement and hired a vice president during that time

13 frame, all right during that time frame.

14     Q     Approximately 2003?

15     A     Yes.

16     Q     Prior to that, how were you employed?

17     A     President of Matthews Buses in 2000.  Prior

18 to that I was vice president of Matthews Buses.

19     Q     Have you ever had employment outside the

20 Matthews family of businesses?

21     A     Yes.

22     Q     What endeavor was that?

23     A     I worked at Ohio University as a teacher.

89

(G. MATTHEWS - FRIEDMANN)

1    Q    What year was that?

2    A    1985.

3    Q    Until?

4    A    I'm sorry.  1986.

5    Q    During what period of time?

6    A    1986-87.

7    Q    What was your next full-time employment?

8    A    Matthews Buses.

9    Q    Have you been involved in any litigation

10 prior to this piece of litigation?  As part of your

11 employment I mean, not personally.

12   A    Yes.

13   Q    On how many different occasions?

14   A    Twice.

15   Q    And have you ever been involved in any

16 litigation in your personal endeavors?

17   A    No.

18   Q    Have you ever testified before a court

19 before?

20   A    No.

21   Q    Have you ever given a deposition before?

22   A    Yes.

23   Q    On how many different occasions have you

A.S.E. REPORTING SERVICE
(518) 458-1091

90

(G. MATTHEWS - FRIEDMANN)

1 given depositions?

2      A      Once.

3      Q      Have you been involved in any arbitrations

4 that involved testifying before an arbitration panel?

5      A      Can I go off the record?

6            MR. McDONALD:   Sure.

7            (Discussion off the record.)

8      A      No.

9      Q      Can you tell me, sir, during the time frame

10 beginning with January of 2003 and running through

11 until January of 2005, in that two-year period, what

12 were your duties with Upstate Tours?

13      A      I was basically responsible in overseeing

14 the company.

15      Q      All aspects of the company?

16      A      Yes.

17      Q      And in terms of the hierarchy, who were the

18 people that reported to you?

19      A      Drew Tuller was the vice president, he was

20 basically the operations manager and ran the facility

21 and the company at the time.

22      Q      And was there anybody else that reported to

23 you?

91

(G. MATTHEWS - FRIEDMANN)

1      A      Well, everybody there.  I mean everybody

2 that worked there.

3      Q      He was the only direct report?

4      A      Yes.

5      Q      Who were the members of the Matthews team,

6 if there was one?

7      A      That would be Drew and myself.

8      Q      Who would make the decision on what vehicles

9 to purchase, what vehicles to sell?  Who was involved

10 in that decision?

11      A      I would.

12      Q      Other than yourself, were there any other

13 people that were consulted?

14      A      Yes.  Drew Tuller, he brought the

15 recommendations to me, too.

16      Q      Did you work with any third party consultant

17 on this transaction?

18      A      No.

19      Q      Have you worked, or had you worked in the

20 past with any third party consultants?

21      A      In Upstate?

22      Q      Correct.

23      A      Not that I'm aware of.

92

(G. MATTHEWS - FRIEDMANN)

1    Q    I'm sorry?

2    A    Not that I'm aware of.

3    Q    Did Conrad report directly to you?

4    A    No.  Directly to Drew.

5    Q    How long was Conrad with the company?

6    A    I don't know the length of time exactly.

7    Q    In terms of the operations with your

8 vehicles, when you came -- let's talk about the Fenway

9 Park trips.  Did your vehicles pay tolls when they

10 went there?

11    A    Yes.

12    Q    Did they pay tolls in Massachusetts?

13    A    Yes.

14    Q    Did they have to pay for parking at Fenway

15 Park?

16    A    I don't know.

17    Q    There would be some records that would

18 indicate that?

19    A    If we can find them.

20    Q    When you would decide what tours to run or

21 not run, before you actually advertised it to the

22 public, would you consider what expenses would be

23 incurred in running that tour?

A.S.E. REPORTING SERVICE
(518) 458-1091

93

(G. MATTHEWS - FRIEDMANN)

1     A     Yes.

2     Q     And then you would set a price for each

3 ticket to be able to run that tour?

4     A     Yes.

5     Q     Presumably to make a profit on the tour?

6     A     Yes.

7     Q     Would you include in the cost of the ticket

8 that you would sell whether you had to pay for

9 parking?

10     A     I don't know that.

11     Q     Who would be the person that would be --

12     A     Rephrase the question?

13     Q     Yes.  In terms of the factors that you would

14 consider in pricing your tours, would the cost of the

15 parking of the vehicles be one of the elements that

16 would be considered?

17     A     Possibly.

18     Q     Would tolls be considered?

19     A     Yes.

20     Q     Fuel usage?

21     A     Yes.

22     Q     If it was a destination where a ticket

23 needed to be purchased, such as the Red Socks, would

94

(G. MATTHEWS - FRIEDMANN)

1 that be part of the consideration of the price?

2      A     Yes.

3      Q     Did you have to pay any use taxes in

4 Massachusetts for your trips into Massachusetts?

5      A     I don't know.

6      Q     Who would have the records of any use taxes

7 that were paid, if at all?

8      A     I'm not sure we even have them in -- like I

9 said, we would either have the records stored or the

10 company has them.  I'm not sure.

11     Q     Did the tour company, your tour company, did

12 it have its own checking account or accounts?

13     A     Yes.

14     Q     Separate from the other Matthews businesses?

15     A     Yes.

16     Q     With whom did it bank in the 2003 to 2005

17 time frame?

18     A     Adirondack Trust.

19     Q     I'm sorry?

20     A     Adirondack Trust Company.

21     Q     Does it still do business as Adirondack

22 Trust or --

23     A     Yes.

95

(G. MATTHEWS - FRIEDMANN)

1     Q     Has it been purchased?

2     A     No.

3     Q     Where is it located?

4     A     Saratoga Springs.

5     Q     And did your business have one account or

6 multiple accounts?

7     A     Multiple accounts.

8     Q     Did it have -- I'm sorry.  What types of

9 accounts did it have?

10     A     Checking account -- for that particular

11 business?

12     Q     Correct.

13     A     It would be a checking account.

14     Q     What other account did it have for any other

15 business?

16     A     There's other checking accounts for the

17 other businesses.

18     Q     Were you required for any of the --

19     A     Line of credit.  There's a line of credit.

20     Q     Okay.  For any of the charters, were you

21 required to maintain escrow accounts until the charter

22 was run?

23     A     I'm not really sure how we handled that.  We

A.S.E. REPORTING SERVICE
(518) 458-1091

96

(G. MATTHEWS - FRIEDMANN)

1 had deposits.

2      Q      Was there one main account from which bills

3 of Upstate Tours would be paid?

4      A      Yes.

5      Q      And so presumably the bank would still also

6 have records of cancelled checks?

7      A      Absolutely.

8      Q      Did you make any requests to your bank for

9 copies of any cancelled checks in preparation for

10 today's deposition?

11      A      No.

12      Q      Are you the person designated by Upstate

13 Tours as the one most knowledgeable of its business

14 transactions for the purpose of this deposition?

15      A      Overall, yes.

16      Q      And were you aware that this deposition was

17 being taken both for jurisdictional issues and

18 substantive issues?

19      A      Yes.

20      Q      And so you are the person that is being

21 provided as Upstate Tours' person most knowledgeable

22 on those subjects?

23      A      Specifically, you know, you're asking

A.S.E. REPORTING SERVICE
(518) 458-1091

97

(G. MATTHEWS - FRIEDMANN)

1 specific questions.  We've got a lot of employees.

2    Q    But you did not bring any of those other

3 employees here with you today to answer on any of

4 those other subjects, did you?

5    A    No.  Keep in mind, I sold the company and

6 they don't work for me anymore.

7    Q    I understand what you're saying, sir, but

8 that doesn't necessarily relieve you of your legal

9 obligations.  I'm not going to dispute that with you.

10 Could you look, sir --

11         MR. FRIEDMANN:  Tom, could we have

12         Exhibits 3 and 4 back a minute?

13              (Handing)

14    Q    I was unclear on this, sir.  I would like to

15 show you Exhibits 3 and 4, respectively, and ask you

16 to look at those for a second, please.

17    A    Uh-huh.

18    Q    Do you recall testifying about those a few

19 minutes ago?

20    A    Yes.

21    Q    Was your testimony that Exhibit 3 is not

22 Upstate Tours -- when I say Upstate Tours, I mean the

23 Matthews related to Upstate Tours web site?

98

(G. MATTHEWS - FRIEDMANN)

1      A    I didn't say that.  I said it's cut off,

2 so...  Appears to be.

3      Q    It appears to be in the upper right-hand

4 corner on Exhibit 3, it appears to have the Matthews

5 Group, Inc. logo?

6      A    That's not our official logo.  But it

7 appears to be.

8      Q    Okay.  It does say Upstate Tours on it?

9      A    Yes.

10      Q    And it lists various tours or trips that

11 Upstate Tours was offering for sale on the web site?

12      A    It's two dates.

13      Q    Well, it lists a number of dates.  Two of

14 them are highlighted to go to Boston, the Boston,

15 Massachusetts area?

16      A    Yes.  Correct.

17      Q    But it lists other locations also?

18      A    Yes.

19      Q    On the second page, there is a trademark

20 denoted at the very end.  Do you see that, where it

21 says Upstate Tours?

22      A    Uh-huh.

23      Q    And then the registration mark, 2004, all

A.S.E. REPORTING SERVICE
(518) 458-1091

99

(G. MATTHEWS - FRIEDMANN)

1 rights reserved?

2      A      Yes.

3      Q      Did Upstate Tours register a web site

4 sometime in 2004 to advertise on line?

5      A      I don't know.

6      Q      That's what the document appears to say?

7      A      That's what it appears to say, yes.

8      Q      Could you look also at Exhibit 4 for a

9 moment.  I think your testimony was that this was the

10 Saratoga LLC Upstate Tours as contrasted from the

11 Matthews Upstate Tours; is that correct?

12      A      Correct.

13      Q      And on the second page of that, there is

14 also a registration mark.  That one indicates that

15 it's a registration mark for the LLC; is that correct?

16      A      That's what it says, yes.

17      Q      You do not have any knowledge of that, do

18 you?

19      A      No.

20      Q      Okay.  When was the last time that the

21 Upstate Tours that was owned by Matthews or a Matthews

22 related entity last did a tour into Massachusetts?

23      A      I don't know.

A.S.E. REPORTING SERVICE
(518) 458-1091

100

(G. MATTHEWS - FRIEDMANN)

1     Q     Was it doing it in 2005?

2     A     I don't know.

3     Q     You do not know the date when one actually

4 ran?

5     A     No.

6     Q     But you know that it was being advertised to

7 do tours into Massachusetts in 2005?

8     A     That appears so, yes.

9     Q     Do you know if it was advertising tours in

10 2004?

11     A     I don't know.

12     Q     How about in 2003?

13     A     I don't know.  I could assume.

14     Q     Well, would you have continued --

15          MR. McDONALD:  Don't assume.

16     Q     Would you have continued to advertise tours

17 and go through the trouble of having employees set up

18 tours and contact vendors in Massachusetts if you were

19 not intending to run them?

20     A     No.

21     Q     You were questioned about the trip logs by

22 bus.  Do you recall that?

23     A     Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

101

(G. MATTHEWS - FRIEDMANN)

1     Q     As part of the normal and usual business

2 records that you maintained, would your drivers need

3 to keep driving logs or driver logs?

4     A     Yes.

5     Q     Why do they keep driver logs?

6     A     CDL requirements.

7     Q     What are CDL requirements?

8     A     Commercial driver's license.

9     Q     They are only permitted to drive a certain

10 number of hours before they take breaks, etc.?

11     A     Yes.

12     Q     Where are those CDL logs maintained?

13     A     At Upstate at Geyser Road.

14     Q     Would those CDL logs indicate which of your

15 drivers drove routes into Massachusetts?

16     A     Yes.

17     Q     Do you know how frequently your drivers

18 drove routes into Massachusetts?

19     A     No.

20     Q     Were particular drivers assigned to

21 particular buses?

22     A     At one time, yes.  I'm not sure exactly when

23 the practice changed.

A.S.E. REPORTING SERVICE
(518) 458-1091

102

(G. MATTHEWS - FRIEDMANN)

1    Q    Well, if you were running particular trips,

2 wasn't it your practice to try to have somebody who

3 was familiar with a particular route drive that route

4 as opposed to somebody who had never driven that route

5 before?

6    A    No, not really.

7    Q    You were not concerned about them getting

8 off at the wrong exit or getting onto Sturro Drive

9 where buses are not allowed, or things like that?

10    A    No.  I'm sure they were given directions

11 prior to going there.

12    Q    Do you recall any instances where your

13 company received any fines in Massachusetts for

14 driving on roads that are restricted to non-commercial

15 vehicles?

16    A    Not that I'm aware of.

17    Q    In addition to the driver logs, were also

18 logs kept by bus?  And I mean logs other than the

19 maintenance records or the maintenance logs that we

20 have looked at?

21    A    I don't know.

22    Q    Who would know if each bus maintained a log?

23    A    Drew Tuller.

A.S.E. REPORTING SERVICE
(518) 458-1091

103

(G. MATTHEWS - FRIEDMANN)

1    Q    With regard to the maintenance logs that you

2 were shown, I believe they were Exhibits 5 and 6.  Why

3 don't we just start with Exhibit 5 for a second.

4         With regard to Exhibit 5, is that something that

5 was created in the ordinary course of your business?

6    A    On the computer, yeah.

7    Q    So the entries that are reflected on that

8 report were entered at or about the time the event

9 reported took place?

10    A    Yes.

11    Q    And it was done in the ordinary course of

12 your business to maintain those records?

13    A    Yes.

14    Q    Was it done in anticipation of this

15 litigation?  Or was it done in the ordinary course?

16    A    Ordinary course.

17    Q    And who was it that would be making those

18 entries?

19    A    Conrad.

20    Q    Would it be -- I'm sorry?

21    A    Conrad Thorwarth.

22    Q    Would anybody other than Conrad be

23 authorized to make those types of entries?

104

(G. MATTHEWS - FRIEDMANN)

1    A    Not that I'm aware of.

2    Q    You mentioned before with regard to that

3 entry on page 13 about the placing -- the odometer,

4 you mentioned before that you thought that was

5 something that was initiated by Prevost?

6    A    That's what I was told by Conrad.

7    Q    So you have no personal knowledge of how

8 that took place?

9    A    No.

10    Q    When did Conrad tell you that?

11    A    Just the last two times I talked to him.

12    Q    So he did not tell you about the events at

13 the time they were occurring, he told you that at some

14 point in time after your company was served with the

15 complaint in this action?

16    A    Yes.

17    Q    Did you ever have any discussions with

18 Conrad or anybody else about the changing of the

19 odometer on this bus or any other buses at the time

20 those events occurred?

21    A    No.

22    Q    Do you have any personal knowledge of -- and

23 by personal knowledge, I mean things that you knew as

A.S.E. REPORTING SERVICE
(518) 458-1091

(G. MATTHEWS - FRIEDMANN)

1 opposed to what somebody else like Conrad told you he

2 knew.

3        Do you have any personal knowledge of why the

4 instrument cluster was changed or why the odometer was

5 changed?

6        A    No, other than what I've been told.

7        Q    Other than what Conrad has told you?

8        A    Yes.

9        Q    Did Conrad tell you whether, at the time

10 that the change was made to the odometer, he initiated

11 anything in writing with Prevost to document what had

12 occurred?

13        A    Not that I'm aware of.

14        Q    Now, is it your testimony that all of the

15 Prevost buses had their odometers changed in that same

16 time?

17        A    No.  There was a recall, and any of them

18 that were affected would have had.

19        Q    How many Prevost buses did you have at that

20 time?

21        A    Twelve.

22        Q    And how many of them were affected by the

23 recall?

A.S.E. REPORTING SERVICE
(518) 458-1091

106

(G. MATTHEWS - FRIEDMANN)

1    A    I don't know.

2    Q    Do you know if any other ones were affected

3 by the recall other than this one vehicle?

4    A    I don't know.

5    Q    Have you made any inquiry to any of your

6 employees or former employees on that subject?

7    A    I asked Conrad.  And he basically said there

8 was a recall.

9    Q    But you did not ask him how many of the

10 buses and which buses?

11    A    No.

12    Q    He would be more knowledgeable than you on

13 that subject?

14    A    Yes.

15    Q    Would he be the one that would be most

16 knowledgeable about the replacement of the instrument

17 cluster by Prevost?

18    A    Yes.

19    Q    At least from your company?

20    A    Yes.

21         MR. McDONALD:  I just want to say,

22         Conrad is no longer with our company.

23    A    Right.  He works for the --

A.S.E. REPORTING SERVICE
(518) 458-1091

107

(G. MATTHEWS - FRIEDMANN)

1      Q      So you do not know how it was reflected on

2 any of the other vehicles that the instrument cluster

3 was changed or not changed?

4      A      No.

5      Q      In terms of the computer programs that you

6 currently still have, do you still have, as part of

7 your business, computer programs that generate these

8 maintenance reports?

9      A      No.

10     Q      So you would not have access currently to

11 any of the other vehicles' maintenance reports to see

12 if their odometers were also changed at the same time

13 as this bus's odometer was changed?

14     A      Correct.

15     Q      And you have no knowledge of why the

16 odometer that was put in to replace the original

17 odometer was set at 55,803 miles?

18     A      No idea.

19     Q      Do you know if it was a rebuilt odometer?

20     A      No, I don't.

21     Q      Who made the decision to replace the

22 odometer with one with 55,803 miles on it?

23     A      I don't know.  I would assume Prevost.

108

(G. MATTHEWS - FRIEDMANN)

1    Q    When you were trading in the buses in

2 question to Setra, did you in anyway -- I'm sorry --

3 did Conrad have any involvement in that transaction?

4    A    He spoke directly with the inspector from

5 Setra and Darril King.

6    Q    Were you present when he did that?

7    A    No.

8    Q    How do you know that he took those steps?

9    A    Well, it's what he has reported to me.

10    Q    Is this what he reported to you recently

11 after the litigation started?  Or was this a

12 conversation that took place contemporaneous with the

13 transactions taking place?  If you understand my

14 question.

15    A    I understand the question.  You're asking me

16 to remember what actually happened.  I mean it's a

17 busy place.

18    Q    Well, no.  I'm asking you to tell me if you

19 recall any discussions that you had with him back at

20 the time of the transaction?  Or whether you were

21 telling me this is something post litigation that you

22 had a discussion with him?

23    A    Post litigation.

A.S.E. REPORTING SERVICE
(518) 458-1091

109

(G. MATTHEWS - FRIEDMANN)

1    Q    Okay.  In the ordinary course of your

2 business, I understand that it is very busy, but this

3 was a big transaction for your business, wasn't it?

4    A    Yes.

5    Q    And who was assigned with overseeing this

6 transaction?

7    A    Well, Drew Tuller put the deal together with

8 Darril King and Pat Scully.

9    Q    From your company, though?

10    A    Drew Tuller.

11    Q    Okay.  Would Drew Tuller have reported to

12 you periodically on the progress of the transaction?

13    A    He basically brought a deal to the table,

14 showed me the other deals.  And make a decision.

15    Q    In terms of the physical transfer of the

16 buses, were you involved in the physical transfer?

17    A    No.

18    Q    Who was involved in that?

19    A    Drew Tuller and Conrad.

20    Q    Where did that take place, if you know?

21    A    I don't know.

22    Q    So you don't know if they drove the new

23 buses up to your location and drove the old ones back

A.S.E. REPORTING SERVICE
(518) 458-1091

110

(G. MATTHEWS - FRIEDMANN)

1 or whether it was the other way around?  You don't

2 know how they ferried them or anything?

3     A    I'm not sure.  I don't recall.  One or the

4 other.

5     Q    Do you know if the Exhibit 5, the

6 maintenance report, was provided to Setra by your

7 company at the time the buses were physically

8 transferred to Setra?

9     A    I know all maintenance records were

10 available to Setra.  Whether they physically were

11 given to Setra, I do not know.

12     Q    What other records would there be other than

13 the computer generated version?

14     A    That's all I'm aware of.

15     Q    Do you know whether any operations manuals,

16 any repair manuals, or things of that nature, were

17 given to Setra at the time the buses were physically

18 transferred?

19     A    I don't know.

20     Q    Do you believe that after whatever the

21 requirements of the transaction were between your

22 company and Setra, that your company performed its

23 obligations under that?

A.S.E. REPORTING SERVICE
(518) 458-1091

111

(G. MATTHEWS - FRIEDMANN)

1     A     Yes.

2     Q     Could you look, sir, at Exhibit 7 for a

3 minute?  Do you see on the last page of Exhibit 7

4 there's the pre-owned coach trade in agreement?

5     A     Yes.

6     Q     It appears that it's dated February 12th,

7 2003, is that correct, in the lower right-hand corner?

8     A     Yes.

9     Q     And it looks like it has Drew Tuller's

10 signature?

11     A     Yes.

12     Q     Or his name at least?

13     A     Yes.

14     Q     There's a line with the name Glenn Matthews?

15     A     Uh-huh.

16     Q     With a line through it.  Do you see that?

17     A     Yes.

18     Q     And there's a name written next to it.  Do

19 you know what that name is?

20     A     Drew Tuller.

21     Q     Do you recognize the handwriting?

22     A     Yes.

23     Q     Whose handwriting do you recognize it to be?

A.S.E. REPORTING SERVICE
(518) 458-1091

112

(G. MATTHEWS - FRIEDMANN)

1    A    Drew Tuller.

2    Q    And then there appears to be something to

3 the right, which I don't know if it's meant to be a

4 signature or not.  I don't mean that in a disparaging

5 way.  But do you recognize that handwriting?

6    A    I don't recognize it.  But I mean --

7         MR. McDONALD:  If you don't know, you

8         don't know.

9    A    I don't know.

10    Q    What do you believe it to be?

11    A    It says Drew Tuller.

12    Q    Both times?

13    A    Yes.

14    Q    So twice?

15    A    Yes.

16    Q    And then there is a date next to it?

17    A    Yes.

18    Q    I'm sorry.  In between are the letters VP?

19    A    Yes.

20    Q    As of February 12, 2003, was he authorized

21 to sign this pre-owned coach trade in agreement on

22 behalf of Upstate Tours?

23    A    Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

113

(G. MATTHEWS - FRIEDMANN)

1     Q     Do you see under the pre-owned coach trade

2 in agreement item number 9?

3     A     Yes.

4     Q     It says a copy of the maintenance records to

5 be turned in with trade?  Did I read that accurately?

6     A     Yes.

7     Q     Do you know if that was done?

8     A     As I already stated, I don't know.  I'm

9 trying to recreate old stuff.  I don't know if it was

10 or not.

11     Q     Who would -- from your business, or from

12 your former business, who would know whether that was,

13 in fact, turned in with the trade?

14     A     Drew Tuller.

15     Q     I think you were asked before a few

16 questions about the odometer disclosure statement, do

17 you recall that?

18     A     Yes.  As far as I know, there were no second

19 requests or any other requests for any of this

20 information, so I'm assuming that they received

21 everything.

22     Q     Exhibit No. 8 was the odometer disclosure

23 statement, and you had some discussion a few minutes

114

(G. MATTHEWS - FRIEDMANN)

1 ago about the sentence which begins the second

2 paragraph:  I state that the odometer now reads.  And

3 then there's a mileage in it?

4      A    Uh-huh.

5      Q    You said you thought the initials after that

6 were DC, is that what you stated?

7      A    Looks like DC.

8      Q    Who would be the DC, if you know?

9      A    I don't know.

10     Q    Do you know if anybody from Setra of North

11 America had those initials?

12     A    Not unless King is spelled with a C.  I

13 don't know.

14     Q    So you don't know?

15     A    I mean other than that, no.

16     Q    Do you know anybody from Upstate Transit

17 that has the initials DC?

18     A    Not that I'm aware of, no.

19     Q    On the odometer disclosure statement, this

20 is the odometer disclosure statement that was issued

21 by Upstate Transit, Inc. to Setra?

22     A    Uh-huh.

23     Q    I'm sorry, is that a yes?

A.S.E. REPORTING SERVICE
(518) 458-1091

115

(G. MATTHEWS - FRIEDMANN)

1     A     Yes.

2     Q     Are either boxes 1 or 2 checked off?

3     A     No.

4     Q     But it is your belief, isn't it, that this

5 was signed by a representative of Upstate Transit,

6 Inc. on or about December 17th, 2003?

7     A     Yes.

8     Q     And they were authorized by your company to

9 sign it at the time they signed it?

10     A     Yes.

11     Q     And they did not note that the odometer had

12 been replaced and that its setting changed; correct?

13     A     Correct.

14     Q     So it was not true when it was signed by

15 your authorized representative?

16     A     Pending litigation records, it appears that

17 way.

18     Q     So you would agree with me that at the time

19 this was signed, that was not the actual odometer --

20 strike that -- that was not the actual mileage on that

21 vehicle?

22     A     Based on hindsight of looking at records, it

23 appears to not be the correct amount.  But at the time

A.S.E. REPORTING SERVICE
(518) 458-1091

116

(G. MATTHEWS - FRIEDMANN)

1 that this was signed, the best of his knowledge --

2         MR. McDONALD:  Do not testify as to

3         what Drew did or did not do.

4     A    That's all I know.

5     Q    The person who signed that on behalf of

6 Upstate Tours had authority to sign on behalf of

7 Upstate Tours; correct?

8     A    Yes.

9         MR. McDONALD:  I believe he answered

10        that already.

11    Q    And nowhere does it indicate on the odometer

12 disclosure statement, the trade in, or in any other

13 documentation that was provided at the time of sale

14 that that odometer reading was inaccurate, does it?

15    A    I don't know that to be true.  We haven't

16 determined whether or not the maintenance records were

17 supplied at the time of sale.

18    Q    You don't know that one way or the other?

19    A    Right.

20    Q    So you cannot tell us whether there were any

21 documents --

22    A    Nobody knows that.

23    Q    You cannot tell us, as the representative of

A.S.E. REPORTING SERVICE
(518) 458-1091

117

(G. MATTHEWS - FRIEDMANN)

1 Upstate Tours, as their designee most knowledgeable,

2 whether at the time the vehicle was transferred to

3 Setra that it was disclosed that that odometer reading

4 was inaccurate?

5      A    I can't confirm or deny.  It's what it is.

6      Q    But you understood, when you sold the

7 vehicles or traded them in, transferred title, that

8 you were required to give an accurate statement of the

9 mileage?

10     A    To the best of our knowledge, yes, we did.

11     Q    And at the time you had information that

12 indicated that 151,981 miles was not the accurate

13 information on the bus; correct?

14     A    Provided all this after the fact information

15 is correct.

16     Q    That was in the books and records of your

17 company; correct?  I'm sorry, I didn't hear you?

18     A    I can't verify that that is correct, no.

19     Q    So you're saying now that Exhibit 5, the

20 maintenance report, is inaccurate?

21     A    I didn't say that.

22     Q    So at the time that you transferred the bus

23 from Upstate to Setra, there were books and records of

118

(G. MATTHEWS - FRIEDMANN)

1 your company that evidenced that this odometer

2 disclosure statement was inaccurate; correct?

3    A    What was the date that this was provided?

4              MR. McDONALD:  What was provided to

5         whom?

6              THE WITNESS:  To wherever they got this

7         from.

8    Q    Sir, I'm asking you about your business'

9 books and records.

10   A    Right.

11   Q    Your company's maintenance records

12 indicated, as of the date of sale, that there had been

13 a change in the odometer; correct?

14   A    According to those records, yes.

15   Q    And that was not disclosed at the time of

16 the sale; correct?

17   A    Correct.

18   Q    Now, had this vehicle ever been in any type

19 of an accident prior to its sale?

20   A    Not to my knowledge.

21   Q    Does your company maintain insurance on its

22 vehicles?

23   A    Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

119

(G. MATTHEWS - FRIEDMANN)

1    Q    And does it also maintain warranty insurance

2 on its vehicles?

3    A    Just plain warranty insurance?

4    Q    Maybe I'm using the wrong terminology.  Does

5 your company -- strike that.  At times has your

6 company in the past submitted claims either for

7 warranty work or for extended warranty work for buses

8 for the repairs that are not done --

9    A    Oh, sure.

10    Q    Okay.  What is that process?

11    A    Well, if there's a breakdown or a problem

12 with the bus, so like an engine problem or something

13 like that, it goes to an engine dealer.  You know,

14 they determine whether it's under warranty or not.

15    Q    Do you know if this bus had any such

16 occurrence during its history of its ownership with

17 your company?

18    A    Pre-litigation or post-litigation?

19    Q    Well --

20    A    I mean I've been told.

21    Q    You've been told?

22    A    That it had been to Detroit Diesel for work

23 to be repaired.  And I was also told that Detroit

A.S.E. REPORTING SERVICE
(518) 458-1091

120

(G. MATTHEWS - FRIEDMANN)

1 Diesel entered incorrect information into the ECM.

2      Q    Who told you this?

3      A    Conrad.

4      Q    So Conrad, after the litigation started,

5 told you that the bus had been to Detroit Diesel, and

6 he told you that the people at Detroit Diesel told him

7 that they had made a mistake about this vehicle?

8      A    Yes.

9      Q    So now Detroit Diesel made a mistake on the

10 vehicle --

11     A    Not pertaining to these numbers here.

12     Q    Okay.

13     A    That's -- that's all he said.

14     Q    I'm sorry.  I didn't hear you.

15     A    That's all he said.  Regarding that there

16 was some conflicting information in the ECM, in the

17 computer with Detroit.  But if you look at all our

18 vehicles, we average about 40,000 miles a year on

19 every one of our vehicles.  It's pretty consistent

20 right across the board.

21     Q    So Prevost made a mistake on the --

22     A    They replaced the cluster.

23     Q    Okay.  And altered the odometer, and that

A.S.E. REPORTING SERVICE
(518) 458-1091

121

(G. MATTHEWS - FRIEDMANN)

1 was their mistake?

2      A    Yes.

3      Q    And then Detroit Diesel you're saying

4 altered the ECM?

5      A    That's what I've been told from Conrad.  But

6 it has nothing to do with the report of mileage.

7      Q    When did Detroit Diesel alter the ECM?

8      A    I don't know what the date was.

9      Q    And what did they do?

10      A    I don't know.

11      Q    What was the mileage of the vehicle at the

12 time it went into Detroit Diesel?

13      A    I don't know.

14      Q    And when did Conrad tell you this had

15 happened?

16      A    In one of my phone conversations with him

17 regarding this litigation.

18      Q    You mentioned before that a physical

19 inspection of the vehicles had taken place at your

20 location, do you recall that?

21      A    Yes.

22      Q    Who was physically present at that

23 inspection, if you recall?

A.S.E. REPORTING SERVICE
(518) 458-1091

122

(G. MATTHEWS - FRIEDMANN)

1     A    Again, what I'm being told by Drew Tuller
2 and Conrad is Darril King, a representative from Setra
3 who does their inspection prior to accepting trades,
4 and Conrad.

5     Q    So that is what either Darril or Conrad told
6 you had occurred, but you were not present at the
7 inspection?

8     A    I may have been at the facility, but I
9 wasn't present at the actual inspection, no.

10    Q    And is it your testimony that Conrad told
11 you that during that inspection, that Conrad disclosed
12 to Setra that the odometer had been tampered with or
13 reset?

14    A    He stated to me that he told Darril King
15 that one of them had an incorrect mileage.

16    Q    Let me show you a document and ask you if
17 you recognize this.

18    A    It's physically impossible you realize?

19    Q    Do you recognize this document?

20    A    Yes.

21    Q    What do you recognize it to be?

22    A    It's Detroit Diesel as a claimant.

23    Q    I'm sorry, I didn't hear you.

A.S.E. REPORTING SERVICE
(518) 458-1091

123

(G. MATTHEWS - FRIEDMANN)

1    A    I believe it's a Detroit Diesel claim.

2    Q    Does it appear to have the date of December

3 14, 2000?

4    A    Yes.

5    Q    Why don't we mark that as Exhibit 12.

6         (Exhibit 12 was marked for identification.)

7    Q    Sir, do you see Exhibit 12?  It appears to

8 have an equipment VIN, the last seven digits?  It's

9 about half way down the page on the left.

10    A    Yes.

11    Q    That's the same last seven digits as the

12 vehicle in question; correct?  1012717?

13    A    Do you have that document?

14    Q    I'm sorry?

15         MR. McDONALD:  If you don't know.

16    A    I don't know as I'm looking at the document.

17    Q    Let me show you Exhibit 9, which is the

18 title.

19    A    Okay.  Yes.  I was looking at the wrong

20 serial number.  Yes.

21    Q    The Exhibit 12 has the same serial number as

22 the vehicle that we are talking about in this case?

23    A    Yes.

A.S.E. REPORTING SERVICE
(518) 458-1091

124

(G. MATTHEWS - FRIEDMANN)

1     Q     That Limoliner ultimately purchased?

2     A     Yes.

3     Q     And on there it lists the vehicle being a

4 Prevost H series with Upstate Transit being the owner?

5     A     Yes.

6     Q     And it lists the mileage at that point in

7 time as being 257,409 miles?

8     A     Yes.

9     Q     Is this where you're saying that --

10     A     Obviously this was a mistake, because the

11 vehicle was a '99.  We do about 40,000 miles a year.

12 So obviously something was in error here.

13     Q     Do you know how many miles Detroit Diesel

14 indicates are on the vehicle based on its ECM?

15     A     According to this, it's 257,000.

16     Q     Do you know, as of the time that Limoliner

17 purchased the vehicle, what the ECM reading was?

18     A     No, I have no idea.

19     Q     Are you aware that shortly after Limoliner

20 purchased the vehicle, that it took it into Detroit

21 Diesel and got an ECM reading?

22     A     I believe that was in the litigation papers.

23     Q     You have no personal knowledge of that?

125

(G. MATTHEWS - FRIEDMANN)

1     A     No.

2     Q     What is an ECM?

3     A     It's the computer brain for the unit.

4     Q     Do you know of any instance where the ECM in

5 this vehicle was removed or altered or changed?

6     A     Not that I know of.  But this is obviously

7 an error.  Just look at the date.

8     Q     You believe what is marked as Exhibit 12 is

9 in error?

10     A     Yes.  If they put the wrong number in, then

11 the ECM is going to have the wrong number.

12     Q     When you say they put the wrong number, what

13 are you referring to?

14     A     If they adjusted -- if Atlantic Detroit

15 Diesel altered this or changed this, however they came

16 to that number or if it's an error, I don't know.

17     Q     The ECM, to the best of your knowledge, was

18 never removed from this vehicle, was it?

19     A     Not that I'm aware of.

20     Q     Do you know of any other ECM readings that

21 were taken on this vehicle?

22     A     Not that I'm aware of, other than you said

23 there was one in the litigation that says there was

A.S.E. REPORTING SERVICE
(518) 458-1091

126

(G. MATTHEWS - FRIEDMANN)

1 another one, but not that I'm --

2    Q    Do you know of any other ECM readings that

3 were done during the period that your company owned

4 the vehicle?

5    A    Not that I'm aware of.

6    Q    Did your head of mechanics inform you at the

7 time of this, that is Exhibit 12, that there was a

8 problem with the ECM reading?

9    A    No.

10    Q    Do you know why it was that this vehicle had

11 been brought in for servicing as of December 14th,

12 2000?

13    A    No.

14    Q    Do you know who Paul Mecham, M-E-C-H-A-M,

15 is?

16    A    No.  I assume he's a serviceman, service guy

17 at Atlantic, but...

18    Q    You are referring to it as Atlantic?

19    A    Atlantic Detroit Diesel in Latham, that's

20 where it is.

21    Q    Where is Latham?

22    A    Right outside of Albany.

23    Q    That's in New York?

A.S.E. REPORTING SERVICE
(518) 458-1091

127

(G. MATTHEWS - FRIEDMANN)

1    A    Yes.

2    Q    Was that the Detroit Diesel location that

3 your company regularly and usually used for --

4    A    Yes.

5    Q    -- repairs?

6    A    Yes.

7    Q    How would you decide whether a vehicle was

8 going to Detroit Diesel or whether it was going to be

9 repaired in-house?

10    A    If it had a major engine problem that needed

11 work or if it was under warranty, it would go there.

12    Q    As part of your investigation into this

13 matter, have you spoken to anybody at Atlantic

14 regarding any records that they have relative to this

15 vehicle?

16    A    No.

17         MR. FRIEDMANN:  Those are all the

18         question I have at this time.

19 BY MR. PENDER:

20    Q    I just have a couple more follow ups, sir.

21 One of them was, I had asked you earlier about a

22 company called Matthews Buses, which you have

23 indicated you have a position in Matthews Buses today

128

(G. MATTHEWS - PENDER)

1 and you did back then as well as your position for a

2 time with Upstate Transit; correct?

3      A     Correct.

4      Q     And I asked you if Matthews Buses had any

5 offices in Massachusetts.  You told me no, that the

6 New England office is in Connecticut; correct?

7      A     Correct.

8      Q     But it covers a sales territory which

9 includes Massachusetts; correct?

10     A     Correct.

11     Q     Matthews Buses holds itself out as the

12 largest dealer of buses in the northeast, or

13 something, according to that web site page; is that

14 correct?

15     A     One of the largest.

16     Q     So Matthews Buses sells new and used buses

17 in Massachusetts; correct?

18              MR. McDONALD:  I'm going to object,

19              just to the extent you're seeking

20              information about Matthews Buses and not

21              Upstate Transit.  But you can answer.

22     A     From time to time.

23     Q     The other thing I wanted to ask you about, I

A.S.E. REPORTING SERVICE
(518) 458-1091

129

(G. MATTHEWS - PENDER)

1 don't know if I ever asked you any questions about

2 Exhibit No. 10.  Exhibit No 10 purports to be a Power

3 of Attorney Granted by Company.  I don't know if you

4 have had a chance to look at that or not.

5        A    Uh-huh.

6        Q    And that document bears your signature;

7 correct, sir?

8        A    Yes.

9        Q    You were signing that as the owner of the

10 vehicle at that point, as the president; correct?

11       A    Yes.

12       Q    And you were granting an attorney the power

13 of attorney to Setra for purposes of -- to any

14 employee of Setra for any document that they might

15 need to sign in order to transfer Upstate Transit's

16 title of the vehicle in question; correct?

17       A    Uh-huh.

18       Q    Is that yes?

19       A    Yes.

20       Q    And that's that same 127 --

21       A    12717.

22       Q    12717 is the same vehicle; correct?

23       A    Yes.

130

(G. MATTHEWS - PENDER)

1       Q     And so you understood at the time you signed

2  that document that there some issue, that you believe

3  now that you have read that, about the title?

4       A     I believe so, yes.  I mean I specifically

5  don't remember.

6       Q     But now that you have had a chance -- that's

7  your signature; right?

8       A     Yes.

9       Q     And you were giving to Setra, any employee

10 of Setra, your power of attorney to deal with the

11 title and interest to the vehicle that we have been

12 talking about here?

13      A     Yes.  From M & T Bank.

14      Q     M & T was the lender?

15      A     Right.

16      Q     So if Darril King needed to sign any

17 documents or do anything in connection with the title

18 to this vehicle, this was the document that he could

19 rely on so that he could do that, he had your power of

20 attorney; correct?

21      A     Yes.  I don't believe Darril King was the

22 one doing it.  I think Jennifer Swing was.

23      Q     Jennifer at Setra?

A.S.E. REPORTING SERVICE
(518) 458-1091

131

(G. MATTHEWS - PENDER)

1     A    Yes.

2               MR. PENDER:  That's all the questions I

3          have.

4               MR. FRIEDMANNN:  I have a couple of

5          just follow-ups.

6               MR. McDONALD:   Sure.

7  BY MR. FRIEDMANNN:

8     Q    Sir, just a question or two about the

9  Matthews Group organization.  Is it Matthews Group, is

10 that the name of the holding company?

11    A    Yes.

12    Q    Is it Inc. or anything after that?

13    A    Inc.

14    Q    And was it the 100 percent owner of the

15 stock of Upstate Tours, Inc.?

16    A    Yes.

17    Q    So you don't and didn't own any of the stock

18 in Upstate Tours, Inc.?

19    A    Through the group.

20    Q    You owned stock in the group, and the

21 group --

22    A    Yes.

23    Q    So this is 100 -- Upstate Tours --

A.S.E. REPORTING SERVICE
(518) 458-1091

132

(G. MATTHEWS - FRIEDMANN)

1      A    Fully owned.

2      Q    -- is 100 percent owned by Matthews Group,

3  Inc.?

4      A    Yes.

5      Q    And then the Matthews Speciality Vehicles

6  and Matthews Buses, Inc. are also 100 percent owned by

7  Matthews Group?

8      A    Matthews Buses, Inc. is, yes.  And -- yes.

9      Q    Okay.  So those are all separate

10  corporations?

11      A    Yes.

12      Q    Separate legal entities?

13      A    Yes, legal entities.

14      Q    Matthews Buses, Inc, is that one that also

15  sells used buses?

16      A    We sell new and used buses.

17      Q    New and used, okay.  When you get a bus that

18  you have gotten as a trade in or that you purchased

19  from somebody else, are there certain steps that your

20  business usually and ordinarily undertakes before it

21  then resells that vehicle?

22          MR. McDONALD:  Just for clarification,

23          which business are you talking about?

A.S.E. REPORTING SERVICE
(518) 458-1091

133

(G. MATTHEWS - FRIEDMANN)

1              MR. FRIEDMANN:  I think he said

2        Matthews Buses is the owner of --

3              MR. McDONALD:  I'll object.  Obviously

4        it's pertaining to Matthews Buses.  But you

5        can answer.

6    A    Yes, sure.  We go through steps.

7    Q    Do you know what those steps are?

8    A    Sure.

9    Q    Can you tell me what they are?

10   A    On which side?

11   Q    If you took it in in trade?

12   A    Right.

13   Q    Before you would put it up for sale from a

14 mechanical standpoint --

15   A    It depends who you're selling it to, where

16 it's going to, if it's going to scrap.  It depends on

17 the trade, if it's a trade for resale.

18   Q    That's what I'm talking about.  My question

19 is a specific trade for resale?

20   A    Again, it depends on what the intent of the

21 resale is.  There's obviously State requirements that

22 we sell it within the State for being a

23 passenger-carrying vehicle, we have to bring it up to

A.S.E. REPORTING SERVICE
(518) 458-1091

134

(G. MATTHEWS - FRIEDMANN)

1 New York DOT standards.  Obviously we go through all

2 of the statement papers.  It would depend on the

3 vehicle.

4      Q    Would you normally and usually look at --

5      A    Some go export.  A lot of them go export.

6      Q    Would you normally and usually look at the

7 prior owner's maintenance records to see when the

8 vehicle was last serviced, to see what was needed to

9 bring the vehicle back to the standards that you want?

10     A    In our business?  No.  Just different, the

11 type of trades we get.

12          MR. FRIEDMANN:  I have no more

13          questions.

14          MR. McDONALD:  All set.  Thank you.

15          (Discussion off the record.)

16          MR. FRIEDMANNN:  While we were off the

17          record, counsel for all the parties agreed

18          that the parties will waive the need of the

19          transcript being signed in front of a Notary

20          and the witness signing it under the pains

21          and penalty of perjury will be sufficient.

22          It's also remembered that under our rule,

23          that the expiration of 30 days after

A.S.E. REPORTING SERVICE
(518) 458-1091

135

(G. MATTHEWS - FRIEDMANN)

1          receipt, if it has not been read and signed,

2          it is deemed read and signed.

3              Is that satisfactory to everybody?

4              MR. McDONALD:  Fine.

5              MR. PENDER:  Fine with me.

6              (Whereupon, the Stenographic Record was

7          concluded at 2:50 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

136

1              I N D E X   O F   E X H I B I T S

2      Exhibit           Description              Ident.

3         1        5-Pg Web Site Listings          17

4         2        4-Pg Web Site Listings          20

5         3        2-Pg Web Site Printout          22

6         4        2-Pg Web Site Printoug          23

7         5        22-Pg Fax                       32

8         6        10-Pg Fax                       32

9         7        4-Pg Feb '03 Agreements         49

10        8        Odometer Disclosure Statement   49

11        9        Certificate of Title            49

12       10        Power of Attorney               49

13       11        Affidavit                       65

14       12        Document                       123

15                       O o O

16

17                  INDEX OF EXAMINATION

18                  PAGE

19 MR. PENDER:       4, 127

20 MR. FRIEDMANN:  76, 131

21                       O o O

22

23

A.S.E. REPORTING SERVICE
(518) 458-1091

137

1 STATE OF NEW YORK    )

2                            ss.:

3 COUNTY OF            )

4

5

6        I have read the foregoing record of my

7    testimony taken at the time and place noted in

8    the heading hereof and I do hereby acknowledge it

9    to be a true and accurate transcript of same.

10

11                      _____

                          GLENN MATTHEWS

12
    Sworn to before me this
13
        day of        2006.
14
    _____
15 Notary Public

16

17

18

19

20

21

22

23

A.S.E. REPORTING SERVICE
(518) 458-1091

138

1              C E R T I F I C A T I O N

2          I, ANN M. KOZA, a Shorthand Reporter and

3     Notary Public of the State of New York, do hereby

4     certify that the foregoing is a true and accurate

5     transcript of the proceedings reported by me, to

6     the best of my knowledge and belief, in the

7     matter held on December 5, 2006.

8

9

10

11 Date:                    _____
                              Ann M. Koza
12

13

14

15

16

17

18

19

20

21

22

23

                 A.S.E. REPORTING SERVICE
                     (518) 458-1091

*EXHIBIT*

*C*



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| LIMOLINER, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 05-11888 |
| | ) | |
| SETRA OF NORTH AMERICA, INC., | ) | |
|     Defendant. | ) | |
| SETRA OF NORTH AMERICA, INC., | ) | |
|     Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UPSTATE TOURS, INC. and UPSTATE | ) | |
| TRANSIT, INC., | ) | |
|     Third-Party Defendants. | ) | |

**AFFIDAVIT OF DARRIL KING**

| | |
|---|---|
| STATE OF MASSACHUSETTS | ) |
| | )ss.: |
| COUNTY OF ESSEX | ) |

DARRIL KING, being duly sworn, deposes and states:

1.    I am a resident of the Commonwealth of Massachusetts and am employed as Regional Sales Manager - Northeast for SETRA OF NORTH AMERICA, INC. ("SETRA"), a defendant and third-party plaintiff in the above-referenced matter.

2.    I have personal knowledge of the facts set forth in this Affidavit, and, as Regional Sales Manager – Northeast for SETRA, I am familiar with the facts and circumstances underlying this action.

3.    I understand that this Affidavit is being submitted in support of SETRA'S opposition to UPSTATE TRANSIT, INC.'S ("UPSTATE") motion to dismiss.

4.    I have been employed by SETRA as Regional Sales Manager – Northeast since June 2002 and was so employed at all times relevant to this transaction.

5.     I have performed my duties as SETRA'S Regional Sales Manager – Northeast from my home office located at 90 Ferry Road, Newburyport, Massachusetts 01950.

6.     I have resided at and worked from this Massachusetts address since I began working for SETRA in June 2002.

7.     I was the SETRA employee primarily responsible for negotiating the transaction between SETRA and UPSTATE in late 2002 and 2003, in which SETRA sold to UPSTATE twelve new coaches in exchange for twelve trade-in coaches and additional money (the "transaction").

8.     The UPSTATE employee I principally dealt with in negotiating the transaction was Drew Tuller.

9.     Drew Tuller approached me via telephone in Massachusetts about purchasing new SETRA coaches in late 2002.

10.     At all times that the transaction was negotiated and finalized, Drew Tuller was aware that I worked out of my home office in Newburyport, Massachusetts.

11.     At all times that the transaction was negotiated and finalized, Drew Tuller and I had frequent and regular telephone communications. I participated in these conversations from my home office in Newburyport, Massachusetts, or from my mobile phone that has a Massachusetts area code.

12.     At all times that the transaction was negotiated and finalized, Drew Tuller and I exchanged frequent and regular email communications related to this specific transaction. I sent and received these emails from my home office in Newburyport, Massachusetts.

13.     Drew Tuller and I communicated extensively about the specifications for the new coaches that UPSTATE purchased as part of the transaction. These specifications included the

number of seats, headrests, traytables, media inside the coach, the material for the entrance side panel, and graphics and logos, among other items.

14.    As part of the transaction, I made arrangements from my Massachusetts office for Drew Tuller and a companion to travel to Germany to view the facility where coaches are built and made arrangements for SETRA to assume the cost of $9,600 for airfare related to this trip.

15.    At the invitation of Drew Tuller and UPSTATE, I traveled from my Massachusetts office to view the twelve coaches that UPSTATE tendered to SETRA as trade-ins in this specific transaction, including the coach that was ultimately re-sold to LIMOLINER.



_____  1/12/07
DARRIL KING, Regional Sales Manager – Northeast
SETRA OF NORTH AMERICA, INC.

Sworn to before me this _12_
day of January 2007.

_Patricia A Elliott_
Notary

PATRICIA A. ELLIOTT
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
May 24, 2013

3